# CHARLESTON.

## Liskey v. Snyder.

Submitted November 16, 1904. Decided December 20, 1904.

1. Judicial Sale.—*When Purchase Construed as Mortgage.*

    A purchase of real estate at a judicial sale by strangers to the proceeding and a contemporaneous re-sale thereof by them to the debtor by an executory contract in writing, whereby he is charged with a certain sum in addition to the amount for which it sold at the judicial sale, all in pursuance of a prior verbal contract, though, in form, a purchase of the land, is regarded in equity as a loan of money on the land as security, and the rights of the parties are determined by the principles governing the relation of mortgagor and mortgagee. (p. 622).

2. Mortgagee and Mortgagor.—*Equity of Redemption.—Burden of Proof.*

    Where a mortgagee has obtained from the mortgagor a release of his equity of redemption, the burden is upon him to show that, in obtaining it, his conduct was in all things fair and frank and that he paid for the property what it was worth. (p. 622).

3. Equity of Redemption.—*Release of Redemption Fraudulent, when.*

    If, in such case, it be shown that the mortgagee induced the act of conveyance or release by any indirection or obliquity of conduct, such as an assurance that it is desired for some purpose other than to bar redemption and that it shall not do so, and that there was no consideration for it except the original debt, the release will be set aside in equity. (p. 623).

4. Mortgage.—*Expense of Loan not Usurious.*

    Reasonable expenses by the lender in making a loan, such as those incident to inspection of the land offered as security and examination of the title tnereto, incurred at the instance and request of the borrower and upon his promise and undertaking to pay the same, may, upon full and clear proof, be allowed him and will not render the debt usurious. (p. 641).

5. Mortgage.—*Bill to Redeem.—Costs.*

    Upon a bill by a mortgagor to redeem, the costs of the suit are to be decreed against him, unless he establishes a prior tender of the amount due on the mortgage. (p. 641).

Appeal from Circuit Court, Randolph County.

Bill by Robert Liskey and others against Sampson Snyder

and others.　Decree for plaintiffs, and defendant Sampson Snyder appeals.

*Reversed.*

SCOTT, COBB & MAXWELL, MOLLOHAN, McCLINTIC & MATHEWS, and L. HANSFORD, for appellant.

C. W. DAILEY, ERSKINE & ALLISON, WINFIELD LEGGET, W. B. MAXWELL, and W. S. LURTY, for appellees.

POFFENBARGER, PRESIDENT:

Sampson Snyder, being the owner of a large amount of real estate, consisting of several tracts of land situate in Randolph county, and indebted in a sum exceeding $16,000.00, for which his lands had been decreed to be sold, applied to Robert Liskey, John W. Liskey and W. H. Rickard, all of Harrisonburg, Virginia, for a loan of sufficient money to pay off the debts. This application was made in the latter part of the year 1898, and resulted in an arrangement whereby the land was to be permitted to go to sale and be purchased by Rickard and the Liskeys, but to remain in the possession of Snyder under a contract of purchase from Rickard and the Liskeys at a price $3,000.00 in excess of the purchase money, under the judicial sale, and to be paid by Snyder in four installments, to become due in six, twelve, eighteen and twenty-four months, respectively. This arrangement was consummated on the 23rd day of January, 1899, when the lands were sold to Rickard and the Liskeys under the decree of sale, for the sum of $16,660, of which $1,666 was paid in cash and for the residue of which four notes of $3,748.50 each, payable in six, twelve, eighteen and twenty-four months from date, were executed. On the same day, Rickard and the Liskeys entered into a contract under seal whereby they sold the land to Snyder for the sum of $19,660, of which $6,164.50 was to be paid in six months from the date of the contract and the residue in three equal installments payable in twelve, eighteen and twenty-four months from date, all bearing interest. By this contract Snyder bound himself to pay, in addition to these notes, the expenses of Rickard and the Liskeys in coming to, and returning from, Beverly, and such attorney's fees as they had paid, or agreed to pay, in connection with the purchase; also to keep the builidngs on the real estate fully

insured, to commit no waste, and to pay off and discharge the taxes assessed on the land and keep the taxes paid thereon until the contract of sale should be fully executed. It was further provided that upon the payment of all the purchase money, the vendors should execute a deed to Snyder with special warranty, and that the provision against waste should not prohibit Snyder from making sale of any of the timber on the land with the consent of the vendors, and applying the proceeds on the purchase money. At the same time a deed of trust was executed by Sampson Snyder and one John W. Snyder, conveying a lot of personal property to secure the payment of the notes executed by Sampson Snyder for the purchase money specified in the contract of sale, and in said contract it was agreed that, if Snyder should fail to comply with the terms of the contract of sale and the provisions of the deed of trust, then the vendors should have the right "to enter upon and take possession of the property" mentioned and described in the contract.

The record shows three letters written by Snyder to W. H. Rickard, bearing date December 28, 1898, and January 5 and 11, 1899, representing that $15,000 or $16,000 would relieve the land, and appealing to Rickard to obtain a loan of that amount for him and offering the land as security. On the 11th day of January, 1899, Rickard wrote Snyder, saying he had seen several gentlemen whom he could interest in Snyder's behalf and that he felt certain that if the property was worth what Snyder had said it was, and $15,000 would make the title clear, they would buy it at the price of $15,000 and resell it to him and give him an extension of time for such an advance as was reasonable, but they would not go security nor lend money out of the State of Virginia. Further on in the letter, it is said, "Of course you would have to pay more for the property, say $3,000." There is no controversy as to the amount of the advance, but it is insisted by Snyder that this transaction, although an absolute sale on its face, was in fact a mere loan of money by Rickard and the Liskeys and that the papers executed must be regarded as constituting, in equity, a mortgage securing the repayment of the money. Snyder insists that he paid off some debts and reduced the amount charged upon the land to the sum of $16,600 for the express purpose of bringing the indebtedness within such limits as would induce the purchasers to take the land as a security for their advancement to him, and

also that, in pursuance of an understanding with them, he, on the day of sale, represented to persons intending to become bidders that the purchase by Rickard and the Liskeys would be made for his benefit. These claims of Snyder's are controverted, but it is not denied that the purchase was made with intent to resell to Snyder at an advance of $3,000, nor that this intention was effectuated.

Snyder having failed to meet the payments as provided in the contract of sale, an agreement under seal was made on the 6th day of October, 1899, between Rickard and the Liskeys on one side and Snyder and his wife on the other whereby, in consideration of one dollar and that Rickard and the Liskeys surrender unto Snyder the bonds and deed of trust aforesaid, Snyder and his wife released all their right and title to said real estate and also all claims and demands against the vendors or said property as growing out of any transaction whatever, and it was further provided that "neither party hereto shall have any claim or demand against the other as growing out of the transactions of January 23, 1899." On the same day another contract under seal was executed, whereby Rickard and the Liskeys leased the real estate to Snyder for a period of one year, Snyder agreeing to pay them $600 as balance due on rent for the preceding year and $1,200 as rent for the year expiring October 5, 1900, the receipt of all which rent was thereby acknowledged as having been paid by the sale by Snyder to the Liskeys of 20 two-year-old cattle and 20 one-year-old cattle and ten steer calves, all on the premises and stated to be in the possession of the Liskeys, and in addition thereto an open expense account of $78.76. By this contract, Snyder and wife obligated themselves to keep the above named cattle on the premises free of charge for twelve months, to take care of the property, to pay all back taxes for the years 1897 and 1898 and the taxes for 1899, the latter to be paid by lessors at end of the year, to make such repairs to buildings and fencing and to cut such brush etc., as should be agreed upon by the parties, and keep a correct account for final settlement. The final clause of this agreement reads as follows: "It is further agreed by first parties that if second parties will take good care of premises as above mentioned that they shall on Oct. 5, 1900, by the repayment of $1,868.76, repurchase the personal property, cattle,

herein described as having been sold to first parties Oct. 5th, 1899."

On Oct. 1, 1900, five days before the expiration of the lease, the following receipt and agreement was executed by Rickard, the Liskeys and Snyder and his wife, W. H. Rickard signing for Robert Liskey and Sampson Snyder for Mrs. Snyder:

"Received of Sampson Snyder and Elizabeth Snyder seven hundred and eight, 78-100 dollars, paid as follows: $62.95 in pasturing C. T. Rainter's cattle; $108.85-100, do D. C. Reherd; $60.40, do. J. W. Liskey, and the delivery of eleven cattle for $476.85, all to be applied as a credit upon rent due to October 6, 1900, or to be credited to Sampson Snyder and Elizabeth Snyder on their rental contract, dated October 6, 1899. It is the purpose and intent of all the parties hereto that the above credits are to be applied toward redeeming the cattle as mentioned in the contract of rental dated October 6th, 1899, and signed by Robert Liskey, W. H. Rickard, John Liskey, Sampson Snyder and Elizabeth Snyder, and this receipt is to be used in connection with said contract."

On the 20th day of October, 1900, two other papers were executed. One was a receipt to Snyder for sixty-eight cattle at the price of $1,990.26, to be credited on the rental under the contract of October 6, 1899, and on the rent for an extension of the lease to March 1, 1901, which extension was made by another paper, executed on the 20th day of October, 1900, fixing the rent for the time of the extension at the gross sum of $425. The account between Snyder and the other parties as stated by Mr. Rickard, who seems to have kept the accounts between the parties, charges Snyder with $2,225.00 rent, $437.77 back taxes, and $67.76 balance of expense account, total $2,730.53, and credits him with $709.05, as of October 1, 1900, and $1,990.26, as of October 20, 1900, total $2,699.31, leaving a balance due from Snyder of $31.22. Snyder files an account against the other parties, amounting to $2,861.57, most of the items of which are included in the account as tated by Rickard. The state of this account is not important and need not be settled here, but it is referred to as showing the relation of the parties and their transactions with reference to the land forming the subject of this controversy, and as tending to cast some light upon the real question in the cause.

In some of these transactions, one D. C. Reherd participated, although he, Rickard and the Liskeys all deny that he had any interest in them until sometime in December, 1899. For some time prior to the judicial sale of these lands, Snyder had grazed stock for Reherd, Rickard and the Liskeys. One of Snyder's letters asking for aid was addressed to Rickard and Reherd and the latter was consulted by Rickard in his effort to raise the money. The release of October 6, 1899, was written and signed at Snyder's house and Reherd was there and knew that some papers were being prepared, but denies that he was in the room or knew the character of the papers or what conversations were had. Afterwards, on or about December 20, 1899, according to his statement, he purchased a one-fourth interest from Rickard and the Liskeys in whatever title they had to the land.

Early in March, 1901, Reherd and John W. Liskey went to Snyder's home for the purpose of taking possession of the land, taking with them a man whom they expected to occupy the residence and take control of the lands for them. Snyder refused to give them possession and, on the 19th day of March, 1901, Reherd, Rickard and the Liskeys presented their bill in equity to the judge of the circuit court of Randolph county, setting forth their purchase of the lands and resale thereof to Snyder, Snyder's release and the two leases executed, under which Snyder was holding as their tenant, alleging the expiration of the leases, Snyder's refusal to give possession, his insolvency, the annual rental value of the land to be not less than $1,200, their necessity of having immediate possession by reason of their having about 400 head of cattle which they intended to pasture on the land, and the commission of waste by Snyder in that he had a saw mill on the land and had cut and manufactured timber from the land into lumber of the value of six or seven hundred dollars and was continuing to take the timber from the land; and praying that Snyder be enjoined from cutting any timber on any of the land, from manufacturing the same into lumber, from removing the same from the land or selling it, from cultivating any of the land, pasturing it, cutting hay upon it, gathering and disposing of the fruit, exercising actual ownership over it, collecting or receiving rent from any of the occupants of the land and from

renting or leasing any part of the land, and for general relief. An injunction was awarded.

Snyder answered the bill setting forth the facts hereinbefore stated and claiming that, although the transaction of January 23, 1899, was, on its face, a contract of sale, it was, in reality, a loan from Rickard and the Liskeys to him, he having agreed to pay them $3,000 for the use of their money. As to the release executed October 6, 1899, he averred that, at the time it was executed, it was expressly understood and agreed that it was not to work a relinquishment, in any respect, of his rights as owner of the lands, or to make sale of the timber thereon for the purpose of raising money with which to pay for the land. The principal allegations of the answer in respect to the lease are as follows: "That sometime about October 6th, 1899, plaintiffs, Robert Liskey, John W. Liskey and W. H. Rickard, came to the respondent, at his home near Harman, far from his counsel, and requested him to give them a statement by which they could more effectually raise money to carry on business enterprises which they had then before them, and claimed that they would stand by the contract, as stated in Exhibit 'E' in plaintiff's bill, and would allow him all the time necessary to repay said loan, and would allow even more time if he would execute the statement than otherwise; they also represented that they wished to take in a partner to strengthen their standing and promote their business; they also represented that they had engaged or were about to engage in some large business enterprises which would require a great deal of money, and, on that account, they would be obliged to borrow large sums of money. And they claimed and represented that while they did not want respondent's property, and did not expect him to pay any faster than he was doing, still the situation of their business with him was such, as they claimed, as to impair their credit, and, on that account, they demanded a statement from respondent showing that they were the owners of this vast estate and not the respondent, whereby they might be able to get such credit as they might need for their own purposes, and also to enable them the better to carry the loan held by respondent, and on that day they presented to him and requested the signature of himself and his wife to the paper-writing referred to in the plaintiffs' bill as Exhibit

'F,' which writing was prepared by them and was not fully considered or understood by respondent, but respondent was specially and freely informed by all of said parties and also by the said D. C. Reherd, who was present at the time, and who was taken in by them as a partner in said loan, that said paper-writing was not intended to have any effect upon his ownership and rights to said lands, or impair in any way his indulgence in the repayment of the loan, but that such writing would be the means of enabling them to give him all the time he might need for that purpose." It is further alleged in the answer that the plaintiffs had violated that clause of the contract of January 23, 1899, providing for sale of the timber and the crediting of the proceeds on the purchase money of the lands. In this connection it is averred that in 1899, prior to October 6th, an offer of $9,000 had been made for the timber on one of the tracts and that later other parties had offered $10,000 for it but that the plaintiffs refused to permit the sale; that prior to October 6, 1899, $12,000 had been offered for what is called the home place, and the plaintiffs had protested against the sale and assured the respondent that if he would keep the land they would give him all the time he wanted on the loan; and that Taylor and Fenderson of New York were willing and ready to take the timber off one of the tracts and pay $12,000 for it, but that the plaintiffs had prevented the sale by attempting to impose unreasonable terms and conditions. The answer further avers that Taylor and Fenderson had deposited the money in bank and filed their bill against the plaintiffs to compel them to perform an agreement made for the sale of the timber to them. The answer prays that the release of October 6, 1899, be cancelled; that the plaintiffs be compelled to execute the contract of sale of timber to Taylor and Fenderson; that the proceeds of the timber be credited upon the purchase money of the land; that, if necessary, the cause be referred to a commissioner to ascertain the amount of the loan due and unpaid; and that he be allowed a day in which to pay the same.

To this answer the plaintiffs filed a special replication, the most material features of which are a denial of the charges made in the answer respecting the proposed sales of one of the tracts of land, prior and subsequent to October 6, 1899, and the refusal of the plaintiffs to accept or agree to the offers of

sale and the hindering of the sales. As to the offer of $12,000 for the home place, they deny having dissuaded the defendant from taking it and also that they ever had any knowledge of such a proposition, and also the allegations about the sale to Taylor and Fenderson. The replication denies that the plaintiffs purchased the lands in question as agents and trustees of Snyder, that they hold the same in equity for his benefit, and that in executing the notes and paying the expenses, as stated in the contract, the defendant was acting within the premises stated in his answer and relying upon the promises of the plaintiffs to treat their purchase and payment of money as a loan to be repaid. As to the important paper dated October 6, 1899, purporting to be an absolute release from Snyder of all further interest in the land, this replication says: "The plaintiffs further say that it is not true that the contract in writing dated October 6th, 1899, Exhibit 'F' was entered into by the defendants with the plaintiffs because of fraudulent misrepresentation, deceit or fraud made or used by the plaintiffs and all the allegations which allege any such deception or misrepresentation on the part of the plaintiffs, or either of them, for the purpose of obtaining such contract in writing, or that the same was to be used or held by them for any other purpose than that for which its legal import implies, are not true."

Depositions were taken and the cause was submitted on the 7th day of May, 1901, when the court entered a decree by which it was "adjudged, ordered and decreed that the injunction heretofore awarded in this cause be and the same is hereby perpetuated; that the plaintiffs do recover of the defendants the said real estate specifically mentioned and described in their bill in this cause filed, and that a writ of possession do issue directed to the sheriff of this county requiring him to place the plaintiffs in possession of said real estate." From this decree, Snyder has appealed.

The pleadings, evidence and decree must be viewed in the light of the relations which the parties sustained to one another in respect to the transactions and the property involved in the cause. Whether Snyder can have relief from the release executed by him, upon the ground set forth in his answer, which prays affirmative relief against the plaintiffs, assuming that the allegations he makes of representations as to the use to be made

of the release and of the promise and assurance on the part
of the plaintiffs that it should not interfere with or bar Snyder's
right to pay the purchase money and keep the lands to be sus-
tained by evidence, depends absolutely upon whether their
relations were such, at the time of the execution of that release,
as to bring the transactions within equitable principles which
do not obtain between strangers dealing with each other at
arm's length, and on equal footing. As Snyder had failed to
pay what he had bound himself to pay, within the time specified
in the contract, and one of the stipulations of the instrument
was that, in case of such failure, the vendors might re-enter,
by the strict letter of the contract, it appears that in executing
this release, Snyder did only that which he was bound to
do, namely, yield the land into the possession of the plaintiffs.
So viewing the transaction, he lost nothing, was deprived of
nothing, is not injured, and has no right to complain. Posses-
sion of the land, however, was only one of the elements of
Snyder's claim to it. Assuming that the transaction of Jan-
uary 23, 1899, was an absolute sale to the plaintiffs and a
contract of resale by them to the defendant, just what appears
on the face of the papers, the defendant, being in possession
under the contract, held the equitable title to the land, and
even after eviction, with or without an action for that purpose,
a court of equity would still have been open to him for the
assertion of his right to pay the purchase money and compel
a conveyance of the legal title. Hence, conceding the right
of the plaintiffs to re-enter upon the failure of the defendant
to pay the first purchase money note when due, such entry, if
made, would not have cut off the defendant's equity of redemp-
tion. At law, under a contract of sale, the vendor, in case of
failure to pay the purchase money, might have his action of
ejectment for the recovery of the possession of the land or he
may sue at law for the purchase money, or in equity for the
specific execution of the contract. 2 Lom. Dig. ch. 4, §§ 1, 11.
The vendee may also sue in equity for the specific performance
of the contract tendering the purchase money and praying that
the vendor be compelled to convey to him the legal title, although
he is in default in respect to the time of payment, unless by
the terms of the contract it appears that it was intended that
time should be of the essence of the contract. 2 Lom. Dig., ch.

4, ss. 11, 43, 44. This is especially true when the vendee has been put in possession under the contract. In such case, time of payment is rarely, if ever, regarded as material. "Resting on the equitable estate by a person in possession, without clothing it with a legal title, has never been held to be that sort of *laches* which prevents relief. Or, as it may be otherwise expressed, where a party, under an agreement to have a conveyance of land, holds the possesion of the land, time will be no bar to his claim for specific performance." 2 Lom. Dig. ch. 4, s. 44, p. 103; *Crofton* v. *Ormsby*, 2 Scho. &. Lefr. 604; *Zane* v. *Zane*, 6 Munf. 406.

In equity, the vendor, under such conditions, is treated and regarded as a trustee holding the legal title to the land for the benefit of the purchaser, and the purchaser is treated as a trustee holding the purchase money for the benefit of the vendor; and, although the pleadings in a suit to compel specific performance of such contract differ from the pleadings in a suit to redeem from a mortgage and enforce an express trust, the purposes sought, and results attained, by these different bills, are substantially the same. The vendee, mortgagor, or beneficiary of the trust, as the case may be, calls upon a court of equity to invest him with the legal title, but is allowed to do so only upon condition that he pay the purchase money or loan or perform such other duty as he is bound in equity or by his contract to perform. The position that in equity the trust relation is regarded as existing between the vendor and vendee under a contract of sale is sustained by numerous authorities. 2 Lom. Dig. ch. 4, s. 11; 1 Sug. Vend., top p. 270, bot. p. 175; *Atcherly* v. *Vernon*, 10 Mod. 518, 527; *Green* v. *Smith*, 1 Atk. 572, 573; *Moore* v. *Burrow*, 34 Barb. 173; *Wickham* v. *Robinson*, 14 Wis. 493; *Kidd* v. *Dennison*, 6 Barb. 9; *Swartout* v. *Burr*, 1 Barb. 495; *Fouda* v. *Sparrow*, 46 Barb. 109; *Craig* v. *Leslie*, 3 Wheat. 563, 578; *Van Wick* v. *Allinger*, 6 Barb. 511; *Egerston* v. *Peckham*, 11 Paige, 359; *Linscolt* v. *Buck*, 33 Me. 530; *Force* v. *Dutcher*, 2 Green (17 N. J. Eq.), 165; *Kreig* v. *Ruckman*, 6 Green (N. Y.) 599; *Scarlet* v. *Hunter*, 3 Jones Eq. (N. C.) 84; *Taylor* v. *Kelly*, 3 Jones Eq. (N. C.) 240; *Toft* v. *Stephenson*, 1 De G. M. & G., 28; *Reed* v. *Lukens*, 44 Penn. St. 200; *McKechnie* v. *Sterling*, 48 Barb. 330; *Sutler* v. *Ling*, 25 Pa. St. 466; *McCreight* v. *Foster*, 5 L. R. 612; 2 Story Eq. Jur. 550, s. 1, 212.

Concerning the status of parties to a contract of sale of real estate, Jones on Mortgages, at section 218, says: "There can be no sensible distinction between the case of a legal title conveyed to secure the payment of a debt, and a legal title retained to secure payment. The vendor holds the legal title, and all persons must necessarily take notice of it; and although the vendee enter into possession, his deed will of course convey only his equitable title. Like a mortgagor in possession, he has an equity of redemption; while the vendor holds the title by reservation rather than by grant, as in the case of an ordinary mortgage." This important equity on the part of the vendee is recognized by statute in this State. "A vendor, or any person claiming under him, shall not at law recover against a vendee, or those claiming under him, lands sold by such vendor to such vendee, where there is a writing stating the purchase, and the terms thereof, signed by the vendor or his agent." Code, chapter 90, section 20. Section 21 makes provision for the protection of the equitable titles of mortgagors and grantors in deeds of trust, after the accomplishment of the whole purpose for which the mortgage or deed of trust was made. Then section 22 of the same chapter requires the defendant in an action of ejectment to file a notice in writing with his plea in order to avail himself of his equitable defense, and then says: "Whether he shall or shall not make or attempt such defense, he shall not be precluded from resorting to equity for relief to which he would have been entitled, if the said sections had not been enacted."

Unless time is of the essence of the contract here, the equity of the defendant at the time he signed the release was analagous to that of a mortgagor in default. "In all ordinary cases of contract, equity does not regard time as the essence of the agreement. In all ordinary cases of contract for the sale of land, if there is nothing special in its object, subject matter, or terms, although a certain period of time is stipulated for its completion, or for the execution of any of its terms, equity treats the provision as formal rather than essential, and permits the party who has suffered the period of lapse to perform such acts after the prescribed date, and to compel the performance by the other party notwithstanding his own delay." Pom. Eq. Jur., s. 1408. In the note to this section, it is said: "Time may be made essence by express stipulation. No particular form is necessary, but

any clause will have the effect which clearly provides that the contract is to be null, if the fulfillment is not within the prescribed time." These general propositions are abundantly supported by the decisions. *Kirby* v. *Harrison,* 2 Ohio St. 326, (39 Am. Dec. 677); *Jones* v. *Robins,* 29 Me. 351, (50 Am. Dec. 593); *Johnson* v. *Evans,* 8 Gill, (Md.) 155, (50 Am. Dec. 669); *Wells* v. *Smith,* 7 Paige, 22 (31 Am. Dec. 274); *Benedict* v. *Lynch,* 1 John. Chy. (N. Y.) 370, (7 Am. Dec. 484); *Green* v. *Cobillaud,* 10 Cal. 317, (70 Am. Dec. 725); *Cleary* v. *Folger,* 84 Cal. 316, (18 Am. St. R. 187;) *Sowles* v. *Hall,* 62 Vt. 247, (22 Am. St. R. 101). The only provision of this contract from which it might possibly be inferred that it was intended that time should be material is the one giving the right to enter upon and take possession of the property in case of failure to comply with the provisions of the contract and of the deed of trust. This falls far short of the express provisions held to be sufficient in the cases above cited. In them the contracts provided that in case of default, they should be void and the parties thereto should be released from further obligation. The re-entry clause is one of forfeiture only, such as is inserted in mortgages and is not allowed to be enforced in equity without giving the right of redemption after forfeiture. *Hoffman* v. *Ryan,* 21 W. Va. 432.

By the execution of the release of October 6, 1899, Snyder gave up his right to call upon the plaintiffs in a court of equity for the specific execution of their contract, a right somewhat similar to the right of redemption held by a mortgagor, as has been shown. Under such circumstances, equity requires, on the part of him who obtains a release, or conveyance, of the equity of redemption, the utmost fairness and frankness, especially where he pays nothing or an inadequate price for what he receives. The relation is regarded as, in some degree, confidential. Therefore, if it be found that in obtaining this release, the plaintiffs resorted to any indirection or held out any delusive hopes or assurances by way of inducement, it cannot stand and the parties must be placed in *statu quo.* In speaking of such transactions between mortgagor and mortgagee, 1 Bigelow on Frauds, at page 347, says: "Principles are applied almost as stern as those which govern where a sale by a *cestui que trust* to his trustee is drawn in question. To give validity to such

a sale by a mortgagor, it must be shown that the conduct of the mortgagee was in all things fair and frank, and that he paid for the property what it was worth. He must hold out no delusive hopes; he must exercise no undue influence; he must take no advantage of the fears or poverty of the other party. Any indirection or obliquity of conduct is fatal to his title. Every doubt will be resolved against him." This doctrine is fully supported by the following cases: *Villa* v. *Rodriguez,* 12 Wall. 323; *Morris* v. *Nixon,* 1 How. 118; *Russell* v. *Southard,* 12 How. 139; *Holmes* v. *Grant,* 8 Paige 245; *Webb* v. *Rorke,* 2 Scho. & L. 673; *Spurgeon* v. *Collier,* 1 Eden 59; *Vernon* v. *Bethel,* 2 Eden 113; *Toombs* v. *Conset,* 3 Atk 261; *Gubbins* v. *Creed,* 2 Scho. & L. 214; *McLeod* v. *Bullard,* 86 N. C. 210; *Chapman* v. *Null,* 7 Ired. 292; 4 Kent's Comm., 143. In England, it is said, that there is no presumption of fraud in the case of a conveyance by a mortgagor to a mortgagee, in consideration of the mortgage debt only, as there the parties are not held to stand in a relation of confidence, but that transactions between them are looked upon with jealousy when the mortgagor in embarrassed circumstances, and under pressure, sells the equity of redemption to the mortgagee for a sum considerably less than its value. Kerr on Fraud, 194. In this last named work, at page 183, it is said: "The principle on which a court of equity acts in relieving against transactions on the ground of inequality of footing between the parties, is not confined to cases where a fiduciary relation can be shown to exist, but extends to all the varieties of relations in which dominion may be exercised by one man over another, and applies to every case where influence is acquired and abused or where confidence is reposed and betrayed. In cases where a fiduciary relation does not subsist between the parties, the court will not, as it does where a fiduciary relation subsists, presume confidence put and influence exerted; the confidence and influence must, in such cases, be proved extrinsically, but when they are proved extrinsically, the rules of equity are just as applicable in the one case as in the other." In this country, as has been shown, it is otherwise. There is a presumption against the *bona fides* of the transaction, for the burden is upon the mortgagee to show that he paid for the property what it was worth and took no advantage of his superior position in obtaining the conveyance or

release. 1 Big. Fraud, 347-349. This confidential relation is said to exist between the vendor and vendee. Pom. Eq. Jur., s. 963. From what has been said of the relation between vendor and vendee, when the latter is in possession under a contract of sale, it must be apparent that the reason and necessity for jealous scrutiny on the part of the courts of equity in passing upon transactions between them are almost as great as in the case of mortgagor and mortgagee. Indeed, the doctrine extends to all persons who occupy positions of trust and confidence, or influence or dependence, in fact, although not perhaps in law. 2 Pom. Eq. Jur. 963; 1 Story Eq. Jur. 331, s. 323.

Nothwithstanding the general rule in this country that the burden is upon the mortgagee to show that in obtaining a conveyance or release of the equity of redemption, he acted with fairness and took no advantage, it is held that, in order to correct or reform a written instrument, or establish a declaration on the part of the mortgagor at the time he executed the mortgage that the equity of redemption should pass to the mortgagee, or that by a subsequent parol agreement the mortgagor surrendered his rights, the evidence must be plain and convincing beyond reasonable controversy, and if the proofs are doubtful and unsatisfactory, the writing will be held to express correctly the intention of the parties. *Howland* v. *Blake,* 97 U. S. 624; *Hoffman* v. *Ryan,* 21 W. Va. 415; *Van Gilder* v. *Hoffmna,* 22 W. Va. 1; *Lawrence* v. *Dubois,* 16 W. Va. 443; *Davis* v. *Demming,* 12 W. Va. 246. Here is an apparent, but not a real, contradiction. The burden is on the party claiming the relation of mortgagor to establish it. He must show that he was mortgagor and the other party mortgagee. Then, if it appears that the latter has acquired the equity of redemption, the burden shifts and it devolves upon the grantee to show that in procuring the conveyance or release he acted fairly and paid full value.

It is insisted here that the parol evidence offered by the defendant is inadmissible, because in violation of the rule forbidding the contradiction of a written instrument by parol evidence. But it is well settled that in this and the similar cases above named, such evidence is admissible. It is admitted, not to contradict or vary the terms of such instrument, but to establish a constructive fraud, vitiating the instrument, or a

superior equity in the nature of a trust. See the cases last above cited.

Constructive fraud on the part of the plaintiffs, as defined by the foregoing authorities, is abundantly established by the evidence. It is disclosed by surrounding circumstances, conduct of parties, direct testimony and admissions. As has been shown, it is important to ascertain whether an adequate price was paid for the equity released. Nothing whatever was given for it here. The transaction was, on its face, a rescision of the contract of sale, pure and simple. The defendant's right to have specific performance was valuable. According to the testimony of the defendant, the land was worth considerably more than the debt, although when first offered at judicial sale, the highest bid was less than $15,000. The quantity of the land was large, amounting to between three and four thousand acres, of which a good deal appears to have been in good condition for grazing, and a large portion covered with valuable timber. It is charged in the answer and supported by the evidence of the defendant that the land was purchased by the plaintiffs at a great deal less than its value. The averment of the answer was that it was purchased at a price, recognized by the parties to be less than one-third of its actual value. In the replication filed by the plaintiffs, this averment is denied, but it is not shown in the replication or by any testimony introduced by the plaintiffs, that the value of the land was not greater than the amount for which it was resold to the defendant. It is not specifically denied in the pleadings. In applying to plaintiffs for help, Snyder had represented his property to be worth $40,000 or $50,-000, and requested them to verify his statement at his expense. Some investigation was made. Rickard wrote him that if his indebtedness was not over $15,000 and his property was worth what he claimed it was, the money would be furnished and the property purchased and resold to him at an advance of $3,000, and it would then be very cheap. This plan was executed without change except that Rickard had to join the Liskeys to induce them to undertake it. Beyond Rickard's statement that the Liskeys were not very well satisfied with the result of the investigation and refused to make the purchase unless he would join them, there is no testimony contradicting that of Snyder to the effect that the property was worth more than the debt.

Prior to the execution of the release the plaintiffs were indulgent. On June 19, 1899, they were notified by letter that Snyder would not be able to meet the first payment when it should become due, and Rickard replied under date of June 24, 1899, saying that his associates were very much surprised at the contents of the letter and requested Snyder to come over at once and see what could be done. The record shows no other communications between them until October, 1899, when Rickard, the Liskeys and Reherd all went to Snyder's home and procured the execution of the release.

Concerning this transaction, Snyder says they came three or four days or more before the paper was signed, and induced him to sign it by representing that they needed some money in their business and had been compelled to borrow money, by reason of which their credit had become impaired, and if he would execute the release it should not interfere with him, and he should have the land back in the same manner as originally agreed upon.

He says they were all there and talked about this release for three or four days before the arrangement was consummated and that he entered into it by reason of the fair promise made to him and some persuasion on the part of his wife, who had the utmost confidence in the plaintiffs, and with the understanding that his rights were not to be impaired and that he should have longer time in which to pay the money. He says they said they would give him a copy of the writing, but that, as soon as it was acknowledged, they left hurriedly without giving the copy, saying they wanted to get as far as Franklin that day. Elizabeth Snyder, wife of the defendant, says the release was talked about for several days and that the plaintiffs claimed they needed it on account of some of their business dealings, and that, if they got it, they could give her husband more time on the money he owed them and that she heard Rickard say in the presence of the others, in reference to the release, that it should not in any way interfere with the right of her husband to redeem the land, but that they would give him all the time he would ask and more. Nettie Harman, a daughter of the defendant, says she was not present on the day the release was signed, but that she had stayed at her father's house the night before it was signed, and when the release was under dis-

cussion, and that Reherd told her that they wanted the release of the property in order to obtain money and that it was not to have any effect against her father's right in the property, but was simply for their benefit to help them in some way. She further says that on the next morning before she went away, they were talking about the matter at the house. Her father was objecting to the release and Reherd then said they were men of their word and if they did not carry out their branch of the agreement with her father and let him have his property back, he would be a witness for him against the rest of them and would show what the agreement was. M. C. Harman, who took the acknowledgment of the release, says all of the plaintiffs were present while he was writing his certificate of acknowledgment, and one of them said to the defendant, "You need not be uneasy; we have always intended to treat you right, and yet intend to treat you right." This was said in response to an objection made by Snyder to the form of the writing and it was repeated once or twice, says the witness.

On October 10, 1899, four days after the release was executed, Reherd wrote Snyder a letter in which he said, among other things, "I told you when I was at your place that the Liskeys and W. H. Rickard wanted me to join them in the contract in case they had to raise the money to pay for the land; they were after me again as we were coming home." He then asked what he should do about it and expressed a willingness to do whatever Snyder should think best. As a witness he admits the truth of the matter set forth in the letter, and adds that he was requested in May, 1899, to join in the contract. Under date of October 30, 1899, Reherd, in reply to Snyder's letter which does not appear in the record, wrote as follows: "I received your letter of the 25th and was sorry to hear of the terrible fires you have had and hope you have had rain by this time. I saw Mr. John Liskey and W. H. Rickard, and they said I should tell you they would treat you all right about the redemption of your land in a year from now, and that you should not give yourself any uneasiness in the matter." In explanation of this letter, he says, on the witness stand, he should have used the word "resale" instead of "redemption." Being examined about it before its production, and lead to believe it contained the word "authorized," he said he should have used the word

"knowledge" instead of it, and further, "I notice in all of my letters, I was looking over some copies, that I used the word redemption when I ought to used the word resale, and that when I use the word authorized it should have been knowledge, and I will just state here that they never authorized me to make a statement for them as their agent." In a letter to Mrs. Harman, dated November 30, 1899, Reherd said, "I saw a letter your father wrote W. H. Rickard and he seems to fear they will not let him have his farms back; if he makes arrangements to pay for them please tell him for me that he need have no fear of that for I had a long talk with W. H. Rickard and John and Robert Liskey yesterday, and they all said if he could get the money within the twelve months from October, 1899, they would gladly let him have it back, and besides that I would be a witness for your father in case they did not do what they said." As a witness he admits that his associates told him what he, in the letter, represented that they had said, after a labored and unsuccessful effort to convey the idea that his knowledge of the redemption agreement had been imparted by Snyder. Objection is made to the use of these letters of Reherd as evidence, on the ground that he was not interested with Rickard and the Liskeys in the lands at the time they were written, nor, in any sense, their agent. Whether they were admissible or not need not be determined, for Rickard took the stand as a witness for the plaintiffs and solemnly testified to the truth of the salient statements contained in the letters, and that, too, against his interest, after he had joined the original parties as purchasers.

On the 9th day of October, 1899, three days after the execution of the release, Snyder wrote Rickard and the Liskeys, asking what he should do about sowing grass seed, clearing land, fixing up fences, etc., at their expense, in case he should fail to get the land back, and saying, "I will not go further or faster than I would for myself on expenses, if you leave it to me till I see what I can do; if I fail to redeem it, then the expenses and improvements is all left for you to say." No reply to this appears in the record. On October 30, 1899, Snyder wrote that forest fires had greatly damaged the property, asked what he should do about rebuilding the fences and suing the party who put out the fire for damages, and saying, "So it is a big job for you if you should keep the land & if I get it back

or redeem myself the same on me." After suggesting what sort of fence should be built, he said, "But you have the say yet, please advise." To this letter which contained other references to the possibility of redemption, the record shows a reply from Rickard, dated November 1, 1899, saying for himself and associates, that they were unable to say just what he should do about rebuilding the fencing or suing for damages, but that he, as tenant, might take such action as he might think best, leaving to them, as owners, the adjustment of the permanent damages. In the same letter they declined to authorize him to have clearing done on the land. On the 16th day of November, 1899, Snyder wrote again, saying he had, before that time, written them concerning an offer from some parties to buy the timber on the upper farm and that he thought he could get from five to seven thousand dollars cash for it. He reminded them that he had written upon that subject some ten days before but had received no answer, and urged them to permit him to make the sale and apply the proceeds on the purchase money of the land and said he could raise the balance of the money and pay it all up. This letter concludes as follows: "What do you say? Answer at once. The parties is here wanting to buy will pay spot cash. Gentlemen, I think you ought to do this; give me this opportunity to redeem myself. I think that the $3,000.00 that I gave you in the start ought to satisfy you all well; answer at once fully what is the reason you did not answer my other letters like this one on the same subject." On November 20, 1899, Rickard wrote acknowledging the receipt of Snyders's letter and saying the Liskeys were very much provoked that he had had possession of the property for nearly twelve months since he promised to pay the delinquent taxes and had finally written that he was unable to do so, and that they wanted some definite answer at once as the property was threatened with sale. As to the proposed sale of the timber, the letter said: "They say will sell provided they can get its worth, but the timber is not on the market to be hawked about subject to all kinds of offers. If the parties to whom you refer will submit a proposition to us of purchase, we will reply at once. If the offer is, in our opinion, what the timber is worth we will sell if the terms suit us, otherwise it is not for sale." This letter closed with an expression of the hope that "this is a full answer

to your question of sale." This seems to have been very un-satisfactory to Snyder as well as out of harmony with what he had understood up to that time to be the agreement. In reply, he wrote November 22, 1899, saying, among other things, "Yours of the 20th inst. to hand, but nothing in it satisfactory as in answer to my letter or in fact the last two letters. * * * Why do you avoid answering my questions. * * * If you get your $19,000 and its interest what need you care about the taxes? * * * Now all I ask of you gentlemen is to give me the privilege to sell the timber on that upper farm for $7,000 spot cash, and you get the money and credit me with it in my $19,000 or what it is sum over, and I will pay you the rest in a very short time; in time for you to take up all your other obli-gations when the next payment falls due or before; I don't look to get one cent till you are fully paid. Isn't this right? Didn't you say that all you wanted was your money back and the inter-est and your $3,000 profits for your favor; didn't you agree to this? I hope you do not intend to take it all and turn me out of house and home. * * *Why do you hesitate and stand back and give me no chance to redeem myself when opportunity presents itself? * * * Answer me definitely what I can depend on, and not answer so indefinitely and evade my ques-tions; answer as you mean; if you don't intend to let me have my land back say so, and don't keep me in the dark or in a strain." On November 27, 1899, Rickard answered and said: "We are men of our word and will fulfill any promise we make, and it is of no use to repeat same; we positively refused to give you an option on the property or otherwise handicap ourselves or "embarrass" the title of same. We intended visiting you next week and looking over the timber on upper tract and setting price on it, but since you make a direct offer of $7,000.00 for the timber in cash we have concluded to take that for it if tendered within a few days; we have another party who wants to look at it, but if we hear from you or your people that they will take it at above price that will settle the matter with the other gentlemen. So let us hear from you at once. Now, as to selling you the property, we will sell it to you if you are ready to buy "now" right along the lines we have always talked and at the same price, but this does not give you or anybody else an option for the future. If you are not ready to buy then this-

settles the matter for the present; I am sure this is plain enough and ought to be entirely satisfactory to you; we want to be entirely understood; we reserve the right in the future as we have in the past to do just as we do now, viz., consider any proposition made to us to reject or accept same at our pleasure." Snyder seems to have understood from this that he would be permitted to sell the timber and pay for the land as provided in the original contract of January 23, 1899. About two months later, he wrote again saying that he had about consummated a sale of the timber on the upper place at $7,000, and would be able soon to sell the timber on the lower farm and, if so, it would enable him to redeem the land.

In connection with this correspondence, Rickard's testimony must be considered. He says that, after the execution of the release, Snyder and his wife seemed to be very much hurt over their failure, and that the former had said that he felt that he could repurchase the land if they would give him the opportunity to do so upon liberal terms and that, in response to this, he was advised that in all such efforts he would be the worse off, but that if he should get in shape at any time and convince them that he could, with his own money, during the year of his rental contract, purchase the property and save a home for himself, they would be willing to enter into an agreement with him upon such terms as might be agreed upon or liberal terms, but they were not willing to give him an option or anything that might handicap the title or give anybody else the privilege to take their place and get the benefit of a profit that they might have in case of a rise in prices after they had purchased the property in a panic and carried it through when nobody else would pay the price. Rickard also narrows his evidence to the extent of saying that Rickard and the Liskeys had stated, in their conversations with him concerning their agreement with Snyder, that the price at which he was to have the land back had not been fixed. While Rickard does not say at what price he had said Snyder could have the land back, it is to be noted that his language, as given by himself, imported, and was calculated to lead Snyder to believe, that he could have it upon the original terms. They required him to purchase with his own money, denied him the privilege of borrowing money from others, and safeguarded the property from falling into

the hands of anybody but Snyder. While he says this agreement was made after the execution of the release, he admits that it was made on the same day and at the same place. Considering his testimony in connection with the evasiveness of his letters to Snyder, writen in response to Snyder's appeal for an absolutely frank and definite statement as to whether the plaintiffs would comply with what Snyder said was their agreement, namely, that he might redeem, and in connection with the positive testimony of Snyder and his wife and daughter and the corroborative testimony of Harman, the conclusion, that Snyder was led to believe and did believe that, notwithstanding the release, he still had the right to redeem, is irresistible. But Rickard says the agreement or offer to let Snyder have the land back was made after the release was executed. If so, it could scarcely be said to have been an inducement to the execution of that instrument. In this connection, it is to be remembered that Snyder and his wife say the plaintiffs negotiated for this release for a period of at least three or four days and hastily took their departure after its execution. As to these important facts, bearing upon the question, all the plaintiffs are silent. The long pendency of these negotiations is suggestive of persuasion and inducement and corroborative of the testimony of the witnesses for the defendant. If Harman is to be believed, there was some prior oral agreement which, at the moment of acknowledgment, the plaintiffs assured the defendant they would comply with. Rickard admits that there was a sort of consolatory agreement or offer on the day of the execution of the release, but the two Liskeys, who were present, are silent as to whether such arrangement was made on that day even after the execution of the release. Reherd, who undoubtedly had several conversations with these people, and was not only intimate with them, but closely allied with them in business enterprises, and finally joined them in this, testifies to their having told him that Snyder should have the land back if he raised the money within twelve months and does not say they qualified it to the extent to which Rickard qualifies it in his testimony. He does not say they told him the agreement was made after the execution of the release, and it is to be remembered that it was discussed between them for the purpose of informing Reherd of

the exact conditions so that he might know whether to join
them.

Whether made before or after the execution of the release,
the agreement undoubtedly was that Snyder should have the
land back upon payment of the price specified in the contract
of January 23, 1899. This clearly appears from Rickard's
letter of January 27, 1900. What else could he have meant by
saying they would sell Snyder the land right along the lines
they had always talked *"and at the same price?"* His testimony
imports that no price had been mentioned and that it remained
to be fixed, as part of the liberal terms, in case Snyder
should ever become able to re-purchase. The letter of January
27, 1899, flatly stamps this an error and, at the same time, sup-
ports Snyder's claim that a price was fixed, and there is nothing
to indicate that it was different from the original purchase price.
As the agreement was in substance and effect, exactly what Sny-
der claims it was, namely, that he should have the land at the
original price, notwithstanding the release, it is wholly unim-
portant that they called it a re-sale and refused to give an op-
tion. Again, what did he mean by saying right along the lines
they had always talked? Does not "always" go back beyond the
date of the release? Can anybody read these letters without
concluding that Rickard's was written to re-assure Snyder that
he might redeem? Can it be doubted that the words "always"
and "same price" were used deliberately? What could have
been the promise he said it was "of no use to repeat," other
than that Snyder might still pay the money and keep the land?
In the same letter and same connection, Rickard said they
would sell the timber on the upper farm. This, too, was one
of the terms of the original contract. True, he did not say the
purchase money of the timber might be credited on the purchase
money of the land as provided by the contract, but he said the
timber might be sold and Snyder could have the land back, two
of the things asked by him, and evaded a direct answer as to
the right of redemption, and this to a man known to him to be
illiterate, and in a distressed state of mind. It was substan-
tially an admission of the claim of Snyder. To this equivoca-
tion and evasion, add the flat contradiction and admission, on
a vital point just referred to, and the evidence adduced by the
plaintiffs stands self-discredited, while that of the defendants

stands substantially admitted, except on the single question whether the agreement was made before or after the execution of the release.

On this point enough has probably been said to clearly show that the court ought to have found on it for the defendant. But there are other circumstances tending to prove the contention of Snyder. Although the surrender of the purchase money notes is stated in the release to be one of the considerations for its execution, and the release was recorded, they were never surrendered, but are still held by the plaintiffs. Rickard says they together with the deed of trust were left in his custody to be copied and to be compared by Albert Snyder, who was to come to Harrisonburg and bring some cattle to plaintiffs, and then take the papers back to his father, but he never came. Snyder, however, says the papers to be sent him were copies of the release and rental contract. In a postscript to his letter of November 27, 1899, Rickard said: "Some time ago I had the papers copied to send you, but thought you would come over this fall and we could compare copy with original. Is there any one here who could do this for you, or shall I send them to you by mail?" A very natural inquiry here is why should comparison by Snyder be important if original papers were to be sent to him and copies retained by Rickard? Could not Rickard see for himself whether the copies he desired to retain were true and correct? What possible interest could Snyder have in seeing that copies to be retained by Rickard were correct? Again, of what practical use could copies of cancelled and surrendered papers be to the plaintiffs? Was the withholding of these notes, contrary to the terms of the release, an act intended to lull Snyder into a feeling of security and in pursuance of the agreement as claimed by him? Did the plaintiffs hurry away as soon as the release was signed without leaving copies of it and the rental contract, lest Snyder's meditation over the iron-clad terms of these papers should create dissatisfaction and arouse him to a premature demand of his rights under the verbal agreement? This, too, looks probable. Why were these papers not surrendered on October 1, 1900, when Rickard and Snyder appear to have been together, or on October 20, 1900, when Rickard and probably all his associates were at Snyder's house? Is there any reason why they could not have taken them there? Taken in connec--

tion with Snyder's pending efforts to sell the timber and raise
the money to pay for the land, the further detention of the·
notes is rather significant and tends to uphold Snyder's claim
and condemn that of the plaintiffs.    Moreover, at or about the
time the new rental contract of October 20, 1900, was entered
into at Snyder's house, another. extension of sixty days was
given Snyder.    On October 7, 1900, Reherd wrote Snyder, say-·
ing: "I hope you have arranged your affairs so I can try and
get the time extended." This occurred after he became inter-
ested in the land, and before the date of the second rental con-
tract.    Explaining, he says he does not know why he used the
word "extended," but supposes it referred to the refusal given
Snyder to re-purchase within one year from October 6, 1899.
He further contradicts himself. He says that, when the second
rental contract was executed, they told Snyder that if he got the·
money within sixty days, he could buy the place back, but that
"there was no price set," so far as he knew.    Afterward, in
explaining his use of the word extended, he says, "On October
the 6th we had given him the price and terms on the place for
sixty days."

Thus it appears that, treating the parties as vendors and
vendee, under a contract of sale, the defendant is entitled to·
specific execution of the contract, notwithstanding the release
executed by him.    But the theory of the defendant's case is·
that the original purchase by the plaintiffs and re-sale to him,
are to be treated in equity as a loan by the plaintiffs to the·
defendant of money on the faith of the land as security, and
that the transaction was intended to be, and was, in fact, such
loan.    Many cases illustrating the principle relied upon have·
been decided by this Court, but none of them stand upon like,.
or strikingly similar, facts.    It is universally held that the in-
tention of the parties to the transaction, gathered from the cir-
cumstances attending it, the conduct of the parties, the face of
the written contract, and parol evidence, must control. Thomp-
son v. Davenport, 1 Wash. 125; Dabney v. Green, 4 Hen. &.
Munf. 101; Lawrence v. Dubois, 16 W. Va. 443; Sadler v. Tay-
lor, 49 W. Va. 104; 2 Min. Ins. 329; Jones Mort. 258.    Certain
rules have been laid down by this Court for guidance in seek-
ing the intention of the parties, but some of them are clearly
inapplicable here.    It appears that the grantor was hard pressed

for money, but not that the grantees were known money lend-ers. Nor can it be said that the rule of gross inadequacy of price clearly applies here. On the contrary, it is undisputed that Snyder applied to the plaintiffs for a loan, or their endorse-ment for the purpose of enabling him to pay of his indebted-ness, and also that the possession of the land remained with Snyder and without the payment of rent until October, 1899. For the rules laid down by this Court see *Klinck* v. *Price*, 4 W. Va. 4; *Lawrence* v. *Dubois*, 16 W. Va. 443; *Davis* v. *Dem-ming*, 12 W. Va. 281; *VanGilder* v. *Hoffman*, 22 W. Va. 2; *Hoffman* v. *Ryan*, 21 W. Va. 415; *Matheny* v. *Sanford*, 26 W. Va. 386. In all those cases, the relations of the parties and the contracts passed upon were so different from the transactions now under consideration, that these rules furnish very slight aid in this case. The possession of the defendant without pay-ment of rent was consistent with his contract of purchase and can not be regarded as a circumstance in itself strongly tending to show that a loan and not an absolute sale was intended to be effected by the parties. This case resembles not so much those to which reference has been made, as it does a long list of other cases holding that, if an absolute conveyance be made and ac-cepted in payment of an existing debt and not merely as se-curity for it, an agreement by the grantee to re-convey the land to the grantor upon receiving a certain sum within a specified time, does not create a mortgage, but a conditional sale. *Sad-ler* v. *Taylor*, 49 W. Va. 104; *Kerr* v. *Hill*, 27 W. Va. 576; Jones Mort. section 265; *Glover* v. *Payne*, 19 Wend. 519; *Con-way* v. *Alexander*, 7 Cranch 218; *Wallace* v. *Johnstone*, 129 U. S.. 58; *Rue* v. *Doyle*, 107 Ill. 275; *Stratton* v. *Savin*, 9 Ohio 28; *Wallace* v. *Smith*, 155 Pa. St. 78; *Stall* v. *Dehn*, 72 Mich. 645; *Dignan* v. *Moore*, 8 Wash. 312; *Swarm* v. *Boggs*, 12 Wash. 246. In each of these cases there was an absolute conveyance and then a defeasance, either in the deed or a separate paper, providing that the grantee should re-convey within a specified time upon payment by the grantor of so much money, or that within a certain time the grantor might re-purchase. But there was not in any of them any clause by which the grantor bound himself to pay the money and take a conveyance of the land. These defeasances were held to amount to nothing more than options given the grantor to re-purchase, and the conveyances

were held to be conditional sales and not mortgages. Had the defeasances bound the grantor to pay the money and take the land, the conveyances would probably have been held mortgages, since it appears from the opinions delivered that the absence of any clause so binding the grantor was virtually held to be decisive of the question.

In another long list of cases it is held that one who purchases at a foreclosure or execution sale for the benefit of the debtor and upon an agreement to convey to him upon the subsequent repayment of the amount paid, takes the property as a mortgagee, even when the debtor has not actually paid any money toward the purchase, if he has abstained from bidding, or induced others so to do, whereby the purchaser obtained the property at a price below its real value. Jones Mort. section 332; *Ryan v. Dox,* 34 N. Y. 307; *Brown v. Lynch,* 1 Paige (N. Y.) 147; *Sahler v. Singer,* 37 Barb. 329; *Guinn v. Locke,* 1 Head 110; *Heister v. Maderia,* 3 W. & S. (Pa.) 384; *Roberts v. McMahan,* 4 Ia. 34; *Sandfoss v. Jones,* 35 Cal. 481; *Smith v. Doyle,* 46 Ill. 451; *Beatty v. Brummett,* 94 Ind. 76; *Reese v. Roush,* 2 Mont. 586.

The principle announced in these last-named cases seems to be fairly applicable to the transaction now under consideration. The purchase in each of these cases was held to have been made for the benefit of the debtor and upon an agreement to re-convey to him upon re-payment of the purchase money interest and costs. These differ from the cases in the former list in this, that, in the cases in said former list, the purchases were not made at judicial sales, nor upon an agreement to re-convey, nor does it appear that, in addition to the agreement to re-convey, in case the option to re-purchase should be exercised, there was any declaration of trust made by the grantee. In the cases given in the last list all these things appear. An examination of the transaction of January 23, 1899, between the plaintiffs and defendant in this cause, reveals the fact that the purchase made by the plaintiffs at the judicial sale was intended for the benefit of the defendant. It appears from the testimony of the plaintiffs as well as that of the defendant that prior to the sale it was understood and agreed that the plaintiffs would purchase the land of the defendant for the purpose of reselling it to him at an advance of $3,000. This arrangement was perfected, as

has been shown. Snyder, the debtor, paid all the expenses of the plaintiffs, amounting, as he claims, to $300. He says further that he procured certain liens to be released in order to reduce the amount of the indebtedness on the land and on the day of sale kept other people from bidding on the property by representing that the plaintiffs would purchase for his benefit. The plaintiffs do not deny that he paid their expenses, including attorney's fees, nor that he reduced the amount of the indebtedness, nor that he kept persons from bidding on the property, but they say they did not authorize him nor direct him to do so. In his letter of January 11, 1899, Rickard said to Snyder that he felt sure that the persons whom he had seen in Snyder's interest would buy the property and re-sell it to him and give him an extension of time for such an advance as would be reasonable; that they would not go security nor lend money out of the State of Virginia, but were willing to buy the land and trust to Snyder's health to make the payments; that he would have to pay more for the property, naming $3,000, but it would still be very cheap and he would then owe honorable gentlemen who would treat him different from what he had been treated, according to his letters; and that he would have to pay, in addition, all expenses of looking up the title, writing papers, etc., and pay the expenses of four gentlemen to visit him. The terms stated in this letter were fully embodied in the final agreement made and executed by the parties. The plaintiffs purchased and entered into a contract of sale with defendant on the same day. It was all one transaction, fully agreed upon and understood prior to its execution. The plaintiffs did not purchase with the expectation of keeping the land, or deriving any advantage from their purchase except a profit of $3,000 on the transaction. Except for the $3,000, it was confessedly for the benefit of Snyder. Prior to January 23, 1899, Snyder was the legal and equitable owner of the land, subject to indebtedness to various persons amounting to over $16,000. On that day he became the debtor by express contract of the plaintiffs in the sum of over $19,000 and continued to hold the equitable title to the land while the plaintiffs held the legal title for their security. He was their debtor bound by an express contract to pay them the money and take the land. The relation of debtor and creditor existed between him and

them. This is one of the strongest indications of a mortgage. In *Davis* v. *Demming,* 12 W. Va. 246, this Court held that "The distinction between a mortgage and a conditional sale is that where money is not loaned, but is advanced, with an agreement that if it be repaid at a given time the vendee will reconvey the land, and the whole transaction shows clearly that no debt really remained after the execution of the deed, such transaction is a conditional sale; but if, no matter in what form the papers might be drawn, the whole transaction shows that after the execution of the deed the debt still remained, such transaction will be held a mortgage." Jones Mort., section 265, says: "The existence of a debt is the test." In *Conway* v. *Alexander,* 7 Cranch 218, Chief Justice Marshall said: "It is, therefore, a necessary ingredient in a mortgage that the mortgagee should have a remedy against the person of the debtor." On the whole, the transaction of January 23, 1899, in view of the prior understanding and agreement that it should be consummated exactly as it was carried out, and the fact that Snyder paid all expenses, reduced the indebtedness and induced bidders to refrain from bidding, can not be regarded as anything other than a single transaction, the sole object of which was to put the plaintiffs in the shoes of Snyder's creditors with the added advantage of having the legal title in themselves for their security with an additional $3,000 for their risk and the use of their money, while Snyder was to have every other benefit arising from it. This clearly stamps it a mortgage. It is wholly immaterial that the parties did not call it a mortgage, but saw fit to term it a purchase by the plaintiffs and re-sale by them to the defendant. It matters not what they call it. The law fixes its real character. "Whenever there is in fact an advance of money to be returned within a specified time, upon the security of an absolute conveyance, the law converts the transaction into a mortgage, whatever may be the understanding of the parties. Even a sheriff's sale will be converted into a mortgage when it is made the means to carry out the agreement of the parties to raise money by way of loan, and the loan is made in consequence of it." Jones Mort., section 332.

It is needless to say that the reasons given for holding that the release of October 6, 1899, does not bar the right to specific performance, on the theory that the parties stand in the rela-

tion of vendor and vendee, are more clearly sufficient to sustain the like holding that it does not bar the right of the mortgagor to redeem. Viewing the parties as sustaining the relation of mortgagor and mortgagee, equity is somewhat more liberal to the mortgagor than to a vendee seeking specific performance. The latter must tender with his bill the purchase money when he calls for a conveyance of the legal title. 20 Enc. Pl. & Pr. 458, 459. In the case of a mortgagor it is not necessary to make an actual tender of the money with the bill. An offer to pay whatever may be found to be due is sufficient. Jones on Mort., section 1095. In the case of a mortgage it is the practice to direct the land to be sold, the debt and costs paid, and the residue, if any, to be paid to the mortgagor. Bart. Chy. Pr. 992. A vendor has the option to cause the land to be sold and the proceeds thus disposed of or to rescind the contract for failure of the vendee to comply with his part of it. Hence, if the vendee desires specific performance he must aver his readiness and willingness to pay the purchase money, as a bar to the vendor's right to rescind. The omission of this averment in the answer of defendant, praying affirmative relief makes it defective as a cross-bill for specific performance, but that is immaterial since it appears that the relation of the parties is that of mortgagor and mortgagee, on which basis the matters in difference between them must be settled. The discussion of their rights on the assumption that, at the time of the execution of the release, they sustained the relation of vendor and vendee is simply an elaboration and illustration of the principle upon which relief from a release of an equity may be set aside on the ground of constructive fraud.

However, the averment of the answer is hardly sufficient. It may be argued from it that the defendant desires to redeem and is willing to pay the debt, but this averment is qualified and limited by the prayer for relief in reference to the sale of timber as provided in the contract of January 23, 1899. As these sales of timber could not be made except by the consent of the plaintiffs, that clause of the contract is too uncertain to be enforcible. He must unqualifiedly express an offer to pay whatever may be found on the mortgage debt. However, it is familiar law, that when the court can see that on the evidence a plaintiff has a good case, relief in which can not be decreed be-

cause of a defect in the bill, an amendment will be permitted and the cause remanded with leave to amend. Snyder is in a like situation. On the evidence he has a good case for relief by cross-bill, to which his answer corresponds, but it is defective because he fails to offer to do equity. Therefore, the decree can be reversed and the cause remanded with leave to him to amend his answer in this respect.

As the cause is to be remanded with leave as aforesaid, it is proper to say, by way of guidance in further proceedings, that, upon strict and full proof, such as to preclude the existence of any shift or device to evade the statute against usury, the plaintiffs may be allowed any just and reasonable expenses incurred by them in making their loan, and not already paid by the defendant. 27 Am. & Eng. Ency. Law (1st Ed.) 1013; *Brisges* v. *Sheldon,* 18 Blatchf. (U. S.) 507; *Nourse* v. *Prine,* 7 Johns. Chy. (N. Y.) 69; *Smith* v. *Wolf,* 55 Ia. 555; *Beadle* v. *Munson,* 30 Conn. 175. This is not improper where the expense of examining the title and similar services are incurred by the lender at the instance and request of the borrower, and on the faith of his promise to pay it. 27 Am. & Eng. Ency. Law (1st Ed.) 1013; *Harger* v. *McCullough,* 2 Den. (N. Y.) 119; *Thurston* v. *Cornell,* 38 N. Y. 281; *Jones* v. *Berryhill,* 25 Ia. 289. It is proper to remark also that, as the status of the defendant is substantially that of a mortgagor filing a bill to redeem, without having made a previous tender of the amount due, the costs in the trial court are to be included in the decree against him, but not the costs in this Court. 20 Am. & Eng. Ency. Law, 625, citing a large number of cases. No further suggestions are deemed necessary, it being assumed, now that the relations of the parties have been defined, that, under the advice of competent counsel, the defendant will make such amendments in his answer as will give him such relief as he desires within the limits of his rights as herein ascertained.

For the reasons stated, the decree will be reversed, the injunction dissolved, except in so far as it prohibits and restrains the defendants, their agents, servants, employes and tenants from cutting, and manufacturing into lumber, any timber on any of the lands in the bill and proceedings mentioned, and from removing or selling any lumber already manufactured at the mill on said lands, and the cause remanded with leave to both parties

to make such amendments to their pleadings as may be consistent with the principles stated and rights adjudicated as herein indicated, and for such further proceedings as the parties may be entitled to have under principles here announced, and the rules and principles governing courts of equity.

*Reversed.*

BRANNON, JUDGE (*dissenting*):

Sampson Snyder was owner of a number of tracts of land in Randolph county, in all about three. thousand six hundred acres, and became financially embarrassed, and in a chancery suit his lands were decreed to be sold for debts amounting to upward of $16,000.  They were sold under the decree to Robert Liskey, John W . Liskey and W. H. Rickard, for $16,660, and the sale was confirmed.  On the day of the sale, 23d January, 1899, the two Liskeys, Rickard and Snyder entered into a sealed contract by which said Liskeys and Rickard sold to Snyder the same lands for $19,660, and expense of the vendors in travel from Harrisonburg, Virginia, to Beverly, and attorney fees for examining titles.  Snyder paid no money down, but gave his bonds for the purchase money payable at different dates in future.  Said contract provided that on failure of payment Snyder should surrender possession of the lands.  On 6th October, 1899, an agreement under seal was made between the Liskeys, Rickard and Snyder which recited that the Liskeys and Rickard had purchased the lands at the judicial sale, and that Snyder by said contract of 23d January,'1899, had the privilege to redeem the lands by payment of large sums set out in that contract; and that Snyder had found it impossible to raise the money to meet any of the installments payable under that contract, and that in consideration of one dollar paid, and the further consideration that the Liskeys and Rickard surrender to Snyder all bonds executed by him for purchase money under the contract of 23d January, 1899, and also surrender a deed of trust upon some personal property and two lots in the village of Harmon, given by both Sampson Snyder and his son John Snyder to further secure payment of the purchase money required by said contract, the said Sampson Snyder released all right and title to said lands, and all claims and demands against said Liskeys and Rickard or said land growing out of any transaction

whatever, and no party to said agreement should thereafter have any claim or demand against another growing out of said transaction of 23d January, 1899. On the same date with this release agreement, 6th October, 1899, a written lease of said lands by Liskeys and Rickard to Sampson Snyder was made, by which the Liskeys and Rickard let said lands to Snyder for one year, the consideration stated being that Snyder was to pay $600 as balance due on rent for the past year, and $1,200 rent for the year ensuing. Afterward said parties made another written lease, by which the land was leased to Snyder for another term ending 1st March, 1901, for $425. On 20th December, 1899, D. C. Reherd purchased from the Liskeys an interest in the lands. In March, 1901, Robert Liskey, John W. Liskey, William Rickard and D. C. Reherd filed their bill in chancery against Sampson Snyder stating the above facts, and the further facts that Snyder was yet in possession, refusing to surrender it to the plaintiff; that he failed to pay the balance of rent; that a large part of the land was in sod valuable for grazing; another part in fallow, which should be tilled and put in grass; another in a large orchard bearing yearly 3,000 or 4,000 bushels of apples; and another part in merchantable timber of great value; that Snyder was holding possession in order to secure the benefit of the grass, meadow land, the fruit and crops from the fallow land, and to cut, remove and market the timber on the lands, and then had a saw mill on the land and was actively engaged in sawing the merchantable timber and selling it; that unless restrained he would use crops, grass and fruit, and sell the timber, to the irreparable injury of the plaintiffs. The bill alleged Snyder to be insolvent. The bill prayed an injunction against cutting timber and manufacturing it into lumber and removing it, or cultivating and pasturing the land, taking fruit, and for general relief. Snyder filed an answer setting up that he had applied to the Liskeys and Rickard for a loan to discharge the decree against his lands, and that he made an arrangement with them whereby they were to lend him a sum sufficient to pay the decree, the loan to be secured by a lien on the land, and they were to be present at the sale under the decree and bring with them an attorney to advise as to the safety of the loan, Snyder to pay traveling expenses and fee of attorney. That pursuant to this arrangement the land

was knocked down at the sale to Liskeys and Rickard, and the·
sale was confirmed after the execution of an agreement showing·
that the purchase was for his benefit, and he was to have the·
lands on repayment of said purchase money, with interest and
traveling expenses of the purchasers and their attorney from
Harrisonburg, and his fee. .The answer stated that Snyder had
given the Liskeys and Rickard his bonds not only for $16,600,.
the price they purchased the land for under the decree, but also·
$3,000 bonus required by them upon the loan, in addition· to·
interest, traveling expenses and attorney's fee. The answer
charged that Liskeys and Rickard had purchased for the bene-
fit of Snyder at the judicial sale, and they were not in fact the·
purchasers, but merely the agents and trustees of Snyder, and·
took by the judicial sale no title against Snyder except as an
equitable mortgage for the money paid by the purchasers and·
interest. The answer stated that relying upon their promises
he did enter into the contract of 23d January, 1899, by which he
repurchased the lands of Liskeys and Rickard, and gave bonds·
for $19,660. It denied that Snyder abandoned his purchase
under that contract or admitted his inability to pay the money·
required by it, but that on the contrary the timber alone would
pay it. It further charged that the Liskeys and Rickard came to·
his home and requested him to give them a statement by which
they could more effectually raise money to carry on business,
and that they would stand by the sale contract between them,.
and allow him time to pay, and did not want his property, but
that the state of things impaired their credit in certain busi-
ness enterprises, and therefore they wanted a statement from
him showing that they were owners of the lands, and presented
and asked him to sign a writing prepared by them, which he did
not fully consider and understand, and that as they informed·
him that the paper was not intended to have, and would not
have, any effect upon his ownership, he signed it, the same paper
or release mentioned above, dated 6th October, 1899. The an-
swer stated that the two leases of the land were only given to·
strengthen the credit of the Liskeys and Rickard, and not to
operate as a relinquishment of his right to the land. The answer
prayed that upon payment to the plaintiffs of the sum legally
due to them, they be required to convey to him the said lands.
Upon the hearing a decree was entered for the plaintiff perpet-·

uating the injunction, granting a recovery of the lands by the plaintiffs and awarding them a writ of possession, and Snyder appeals.

Snyder rests his case upon the theory that the Liskeys and Rickard bought in the land for his benefit at the judicial sale, and that he is thus entitled to have the land upon principles found in numerous cases. *Currence* v. *Ward,* 43 W. Va. 367; *Walraven,* v. *Lock,* 2 Pat & Heath, 547; *Heiskell* v. *Powell,* 23 W. Va. 717. Though it is the theory of Snyder that the purchase at the judicial sale was in fact for his benefit, his purchase, yet I do not regard even his answer, and more plainly yet his own evidence, as showing that. They show that the contract was that Liskeys and Rickard were to purchase and then sell the land as their own property to Snyder. Snyder could not buy. They were no relation to him, under no call to come hundreds of miles simply to buy in the property for him without profit to themselves. That theory does not bear the face of plausibility. It was a serious thing for them to make this trip and make themselves personally liable for $16,660 for nothing. I do not know that this trust purchase theory is material, in view of the release agreement of 6th October, 1899, and the leases; but if we can say that at the birth of the transation, in the judicial sale, there was no trust, it goes to dissipate Snyder's claim based on a trust. If it did not exist then, when did it arise? If a trust existed, and was not afterward released, it would deny the plaintiffs the so-called bonus of $3,000 in fixing the amount due. But as stated, a fair interpretation of facts stated in the answer and in Snyder's evidence is that there was no arrangement to buy in the land for Snyder's use. That such is the truth is plainly shown, not only by the evidence of Liskey and Rickard, but by a letter from Rickard to Snyder telling him that he had seen some parties in his behalf, and that if his property was worth what Snyder represented and his debts not over $15,000, those parties would buy the property at $15,000, and then sell it to Snyder on time, but would not lend, and that he would have to pay $3,000 more, and traveling expenses and attorney's fee for investigating title. This shows that the sale was not to be in trust for Snyder, and that he accepted the proposition with eyes open to this fact. Will a court of equity make it another contract, a mere loan, in the face of this? Of course, the letter of

the record for the sale is against such trust purchase. Then on the very day of the sale a formal contract is signed by Snyder declaring that the Liskeys and Rickard purchased under that sale, and had sold the land to Snyder. Snyder says as a witness that that contract was agreed to before the sale, that arrangement as to the sale. It was no purchase for Snyder. The parties declined to loan or indorse or act in any other form than as purchasers, with absolute rights as such, and he knew it, and let them purchase on that faith. He says that owing to this arrangement he deterred others from buying, when others would have bought at a higher price. This proves nothing. Would others have sold to him and indulged him? Would the land have sold for more? It had been twice before offered for sale, the best bids being at one sale $10,000, at another $13,000, and then an upset bid of $15,000. This does not show, but negatives, that Snyder could have done better. It negatives inadequacy of price, or any deductions or claims based on that theory, though that cuts no figure in the case. Now, how can Snyder, in the face of all these things, in the face of his written admission in that contract that those parties were the purchasers, deny that fact and say they were purchasers in trust? If so, if that were the truth, we should expect a paper so stating and giving him, in so important a matter, involving his all, a right to simply repay and get his land back? He was about 58 years of age, entirely capable of contracting. True, he was an unfortunate debtor, in hard circumstances, like thousands before and since, and our mere sympathy goes out to him in his distress; but we can not for that relieve him. True, we may say that $3,000 profit was large; but any man has right to drive a good bargain. He urged and begged those people, by letter after letter, to come to his relief; did so when the sale was at his very door, and they evinced no eagerness, and he knew their terms and accepted them. Could he get any body to do better for him? It does not so appear, and if he could have done so, it would be immaterial. These purchasers came far, took upon themselves a large debt, bought land far from them, sold it to a man well advanced in years, without a dollar paid down. Liskey and Rickard on oath utterly deny that they purchased for Snyder, and solemn papers under hand and seal support them. I have said this much, not because I do not think that if such

trust purchase really existed, it was released by Snyder afterward, but to show that there was not such trust at the beginning of this transaction, and thus no superstructure can be reared upon it.

Time passed, and the date of payment for the first installment of purchase money under that contract came, and found Snyder unable to meet it. If he could not raise one-third, how could he raise the balance? The land was involved, and a very large amount, perhaps all of the personal property and two village lots of himself and son also. A large debt was growing and might not be paid by the property. He made a contract by which, in consideration of a release of the debt and the personal property and lots he surrendered his purchase under the contract of 23d January, 1899, By that contract Snyder and wife released "all their rights and titles to said above described property, also all claims and demands against said first parties or said property as growing out of any transaction whatsoever and neither party hereto shall have any claim or demand against the other as growing out of the transaction of January 23d, 1899." Does not this drown and extinguish any trust in the judicial sale? Or in the contract of sale? Or any right in the whole transaction? His first contract promised to surrender the land for non-payment. If not, can people contract at all? Not only that contract, but on the same day Snyder made a lease of the land, and thus became tenant; not only that, but he made a second lease for another term; not only that, but he paid a large amount of rent as tenant. Thus he confirmed that deed of release. No fraud is. shown in it. If there were, it is waived by the second lease at later date, and rent. How is it possible for Snyder to deny the effect of these plain things? Do any writings bind? Does any contract? Snyder says that this release was not to affect his prior ownership. This he says in the teeth of that writing, sealed with his seal; it was a release, and rescission and yet no release, or rescission. So the maker of a note once said that the understanding was that he was not to be bound; but the Court said that he could not prove that underestanding against a plain note. *Towner* v. *Lucas,* 13 Grat. 705. Same principle *Martin* v. *Railroad,* 48 W. Va. 542; *Hukill* v. *Guffey,* 37 W. Va. 426; *Long* v. *Perine,* 41 *Id.* 314; *Miller* v. *Fletcher,* 27 Grat. 403. It is not pretended that the execution of this release created a silent mortgage, so as to ad-

mit oral evidence under that principle; it is simply asserted that it was agreed that it should not release and impair, when itself in its words does that very thing. If the dangerous doctrine of allowing oral evidence to destroy writings can go thus far, then away with the vaunted superiority of written over oral evidence of men's acts, and the rule that oral evidence can not contradict writings. The courts should narrow, not widen, the door allowing such evidence. This practice has largely repealed the statute of frauds. In these days of general education and facilities of making writings there is less need of such a practice than long ago.

In this connection we may say that it is an easy matter to assert a trust for land; but the law steps in with no uncertain tread and says that "parol evidence to establish a trust must be clear and unquestionable." *Armstrong* v. *Bailey,* 43 W. Va. 778. The whole case as put by Snyder in his answer and evidence bears the hue of unplausibility, and is contradicted by his action and the documents. But it is said that these parties occupying the relation of trustees and beneficiary, they could not thus deal with each other. The point is void of any plausibility. Their relation, if it existerd, was not a fiduciary relation of the character to apply that rule, as in case of express trusteeship.

This case is uncontrollably governed by documentary evidence of absolute and certain import, and the oral evidence is therefore unimportant; but if this were not so, a conclusive reason why we should affirm the decree is that the oral evidence is squarely, flatly conflicting, and involves credibility of the witnesses. There is but little law involved, but the case turns on facts, and documents bring in the solvent facts. So far as oral evidence does merit consideration, I will state what is worn and trite, that this Court cannot reverse the lower court when the evidence is contradictory and the crediability of witnesses is involved. *Camden* v. *Dewing,* 47 W. Va. 315.

It is assigned for error that the court perpetuated the injunction and gave the plaintiffs a recovery of the land and a writ of possession. If it is meant that equity has no jurisdiction for injunction at all, the point can not be sustained. View Snyder as a tenant committing waste, equity has clear jurisdiction for injunction to stop waste. That late excellent work, American

& Eng. Decis. Eq., in vol. 2, pp. 660, 668, says that the old common law remedies are now superseded, and that "an injunction will therefore issue to restrain any act of waste by a tenant in possession, whenever the threatened acts amount to a manifest injury to the inheritance and are a wanton abuse of the tenant's rights." "The remedy by injunction is so peculiarly adapted to the redress of injuries which constitute waste, that it has supplanted to a large extent the remedies at law." 28 Am. & Eng. Ency. Law, 922; 2 Taylor, Landl. & Ten. section 691.

Insolvency is not requisite in case of a tenant committing waste. Viewed not as tenant, which he was, but as a trespasser, injunction lies, Snyder being insolvent, as shown by the whole record, and the damage in cutting and selling large quantities of timber entailing large damage. *Becker* v. *McGraw*, 48 W. Va. 539. On the theory disclosed by the answer, that of mortgage, the injunction was proper and could not be dissolved. *Bell* v. *Core*, 20 W. Va. 169. But I suppose the assignment does not mean to question jurisdiction in the inception of the case, but only in perpetuating the injunction and granting recovery of the land and a writ of possession at the end of the case. The case being one of a tenant guilty of waste, it was surely right to perpetuate the injunction without trial at law. *University* v. *Tucker*, 31 W. Va. 621. So if the case were as Snyder contended, one of vendor and vendee, or equitable mortgage and the mortgagor doing irreparable injury, as the evidence clearly shows that Snyder was cutting and sawing with a mill a large amount of timber. But did the court err in giving a recovery of the land and a writ of possession? Viewing the case as that of the tenant refusing possession after term expired, of course, there is no equity merely for the recovery of possession; but as the court had clear jurisdiction for waste, and the bill alleged both waste and unlawful detainer, could not the Court go on to give full relief by delivery of possession under the rule that equity having jurisdiction for one purpose, will give complete relief on the merits and end the litigation, and not turn the parties loose for another law suit? *Hotchkiss* v. *Fitzgerald*, 41 W. Va. 357. But this action of the court does not rest alone on the consideration just stated. The bill set forth the plaintiffs' title to the land, and the defendant's tenancy

and detainer and waste; the answer of Snyder came in setting up his claim under the alleged trust, presented his facts to sustain that defence, justified his detainer of possession under that claim, and as upon a cross bill asked the court to adjudicate his right to the land, and to compel the plaintiff to execute the trust by conveyance of the land to Snyder on payment of the debt. Now, why should not equity, having jurisdiction on the bill, as just stated, and jurisdiction upon the cross-bill of the matters therein stated in defence of the bill, give final decision upon the rights of the parties, and finding that the defendant had no right, give the plaintiffs their property? Note that this is not, like *Freer* v. *Davis,* decided this term, a contest between two distinct titles adverse from their origin, but a question of which of the litigants was entitled to the one only title and the land under it. It is a case where the question is one of equitable right, equitable mortgage which can be adjudicated only in equity. The Court adjudicated against this equitable title, and why should not the Court give recovery and possession to the legal right instead of sending it to a law court to get recovery? The Court, if it decided, had to pass on the respective rights, and ought to have power to effectuate its decision.