**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARION D. JOHNSON; VIVIAN Y.
JOHNSON,
   *Plaintiffs-Appellants,*

    v.

JASON C. WASHINGTON; D AND D
HOME LOANS CORPORATION;
WARREN MIKE ROBINSON,
individually,
   *Defendants-Appellees,*

    and

BNC MORTGAGE, INCORPORATED,
f/k/a Finance America; SAMUEL I.
WHITE, P.C.,
   *Defendants.*

No. 08-1421

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Jerome B. Friedman, District Judge.
(2:07-cv-00204-JBF-FBS)

Argued: January 27, 2009

Decided: February 24, 2009

Before WILLIAMS, Chief Judge, WILKINSON,
Circuit Judge, and Arthur L. ALARCÓN,
Senior Circuit Judge of the United States Court of Appeals
for the Ninth Circuit, sitting by designation.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Williams and Senior Judge Alarcon joined.

---

## COUNSEL

**ARGUED**: Daniel Paul Mosteller, CENTER FOR RESPONSIBLE LENDING, Washington, D.C., for Appellants. Jason E. Manning, TROUTMAN & SANDERS, L.L.P., Virginia Beach, Virginia; Paul R. Schmidt, HUFF, POOLE & MAHONEY, P.C., Virginia Beach, Virginia, for Appellees. **ON BRIEF:** Melissa Briggs, CENTER FOR RESPONSIBLE LENDING, Washington, D.C.; Tanya Bullock, BULLOCK & COOPER, P.C., Virginia Beach, Virginia, for Appellants. Alison R. Zizzo, HUFF, POOLE & MAHONEY, P.C., Virginia Beach, Virginia, for Appellees D & D Home Loans Corporation and Warren Mike Robinson; John Lynch, TROUTMAN & SANDERS, L.L.P., Virginia Beach, Virginia, for Appellee Jason C. Washington.

---

## OPINION

WILKINSON, Circuit Judge:

Marion and Vivian Johnson appeal the district court's grant of summary judgment on their claim that defendants violated various consumer protection laws when purchasing the Johnsons' home. The Johnsons argue that the purported sale of their home actually created an equitable mortgage under Virginia common law, thereby obligating defendants to comply with federal and state lending laws, namely the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and the Virginia Mortgage Lender and Broker Act, Va. Code § 6.1-422. Because we find that the transaction was an absolute sale that did not give rise to any debt between the parties, we conclude that it did not

create an equitable mortgage. We likewise find no merit in the Johnsons' claim of fraud. We therefore affirm the judgment of the district court.

## I.

### A.

We view the facts in the light most favorable to plaintiffs, the non-prevailing party. In December 1995, Marion and Vivian Johnson paid approximately $130,000 to purchase a home in Norfolk, Virginia. In 2002 or 2003, they refinanced their mortgage with NovaStar Mortgage, Inc. ("NovaStar"). In 2005, they fell two months behind in their mortgage payments and sought to refinance again. By this time, plaintiffs claim the home had appreciated to $260,000, with the Johnsons holding about $100,600 in equity in the home and the remaining $159,400 representing the outstanding balance on the NovaStar mortgage. In hopes of refinancing, Mr. and Mrs. Johnson contacted Warren Robinson, a mortgage broker and the president of D&D Home Loans Corporation, who told them it would be difficult to refinance because of their poor credit history and previous bankruptcy filings.

In May 2005, Robinson referred the Johnsons to Jason Washington, a private investor. When Washington met with the Johnsons, he presented them with an "Offer to Purchase Real Estate" that stated that Washington would purchase the home for $212,800. The couple signed this document without reading it. They then met with Washington on June 30, 2005, for a real estate closing, at which they signed a HUD-1 Settlement Statement and a deed conveying title to Washington.

To finance his purchase of the house, Washington took out two mortgages from Finance American, which were secured by deeds of trust on the property. Of the $212,800 total sales price, Washington used $166,600.05 to pay off the Johnsons' NovaStar mortgage. He gave the Johnsons a check for

$44,410.56, which was listed as the "Amount to Seller" in the HUD-1 Settlement Statement.

One week later, Washington and Mr. and Mrs. Johnson signed a Contract for Deed of Real Property ("Contract") that gave the Johnsons an option to repurchase the property within thirteen months for $249,079. This amount included an initial down payment of $36,279 and a final payment of $212,800. The Contract also provided that the Johnsons would remain at the home in return for making monthly payments of $1,896.64 for twelve months, with the first payment due on August 1, 2005. The Contract provided that the Johnsons would lose the option to repurchase after thirteen months, and that the Contract would become a lease agreement if their monthly payments were over five days late. Washington used most of the Johnsons' monthly payment amount to satisfy his payments on the Finance American mortgages. Mr. and Mrs. Johnson continued to live at the property and make monthly payments to Washington, but they stopped making payments in February or March 2006.

## B.

In March 2007, the Johnsons filed a twelve-count complaint against Robinson, Washington, and D&D Home Loans Corporation, alleging *inter alia* fraud, breach of contract, violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, and predatory lending practices under the Virginia Mortgage Lender and Broker Act, Va. Code § 6.1-422. They claimed that the transaction with Washington, despite being clothed in the form of an absolute sale, actually gave rise to an equitable mortgage that required Washington to comply with federal and state consumer protection statutes. They also alleged that Robinson and Washington had misled them about the nature of the transaction by making statements such as "Washington does not want your house" and by telling them they could refinance again in twelve to thirteen months.

Following discovery, the district court granted summary judgment to defendants. *Johnson v. D&D Home Loans Corp.*, No. 2:07cv204, 2008 WL 850870 (E.D. Va. Jan. 23, 2008). The court held that the transaction did not give rise to an equitable mortgage because the Johnsons were never indebted to Washington and "[t]here was no penalty if [they] chose not to exercise their repurchase option." *Id.* at *8. The court also rejected the plaintiffs' fraud claims, finding that Washington and Robinson's statements were either true or were statements of "opinions and expressions of desire," not statements of fact. *Id.* at *5. The district court further held that the Johnsons' fraud claim was precluded because they had "fail[ed] to read any of the documents they were signing." *Id.* This appeal followed.

## II.

The Johnsons' central claim is that the transaction with Washington gave rise to an equitable mortgage under Virginia common law, thereby obligating Washington to comply with federal and state consumer protection statutes. We disagree. Because there was no preexisting or contemporaneous debt between the parties, there is no basis for finding an equitable mortgage. Even assuming some debt did exist, the relevant circumstances in this case do not justify invoking equity to contradict the plain terms of the transaction.

The Johnsons raise claims under both the Truth in Lending Act ("TILA") and the Virginia Mortgage Lender and Broker Act ("MLBA"). The TILA is a federal statute that requires clear disclosure of terms in consumer credit transactions. 15 U.S.C. § 1601 *et seq.* Its protections apply only to loans, not to sales. Similarly, the MLBA governs the practices of licensed lenders and brokers, but does not apply to real estate sales. Va. Code § 6.1-422. Therefore, to show that defendants were required to comply with these laws, the Johnsons must show that their transaction in fact created a lending relationship.

Under Virginia law, a deed that is absolute on its face "is presumed absolute unless the party challenging the presumption can prove by clear, unequivocal and convincing evidence" that it is not. *In re Seven Springs, Inc.*, 159 B.R. 752, 755 (E.D. Va. 1993) (citing *Pretlow v. Hopkins*, 30 S.E.2d 557 (Va. 1944)). The Johnsons therefore bear the burden of showing that the transaction, which purported to transfer ownership of the house from them to Washington, actually created an equitable mortgage.

In assessing whether an equitable mortgage exists, courts ask two questions. First, they ask whether the parties enjoyed a borrower-lender relationship, signified by the presence of a debt secured by title to the property. *Seven Springs*, 159 B.R. at 755-56. "The existence of a debt is the test." *Holladay v. Willis*, 43 S.E. 616, 618 (Va. 1903). This debt must have existed before the transaction or be created contemporaneously with it. *Snavely v. Pickle*, 70 Va. 27, 35 (1877). If a court finds that a debt existed, it then asks whether circumstances warrant finding an equitable mortgage. *See Seven Springs*, 159 B.R. at 756 (listing relevant circumstances).

The requirement of a debt between the parties is more than a formality. As the Supreme Court of Appeals of Virginia noted in *Holladay*, "[a] mortgage without a debt to support it is a legal solecism," and "'neither the intention of the parties nor their express contract can change the essential nature of things.'" 43 S.E. at 618 (quoting *Turner v. Kerr*, 44 Mo. 429 (1869)). This rule is especially important in the context of equitable mortgages. Because such mortgages are an exception to the general rule that parole evidence is inadmissible to contradict the terms of a contract, the proof necessary to sustain them "must be so convincing as to leave no doubt on the mind that a mortgage, and not an absolute conveyance, was intended." *Id.* at 617. Mere statements of intent cannot meet this burden; rather, the presence of debt between the parties is necessary to show the intent to create a mortgage and a

promise to repay. *E.g.*, *Tuggle v. Berkeley*, 43 S.E. 199, 201 (Va. 1903).

In addition, absent some debt between the parties, the grantee (Washington) has no personal recourse against the grantor (the Johnsons) if the property later sells at a loss or the grantee cannot otherwise recover on his investment. As the court noted in *Holladay*, this lack of recourse clearly shows that the parties lacked a debtor-creditor relationship. 43 S.E. at 618. And because purchase and lease-back arrangements such as the Johnsons' are so common, allowing courts of equity to find equitable mortgages based on the testimony of one party alone—a party who later regrets the transaction— could potentially convert any number of real estate sales into equitable mortgages.

The Johnsons acknowledge that the court must find some debt between the parties. But they argue that the Contract's option to repurchase constituted such a debt, and that the consequence of not making the repurchase payments was the loss of their home. But Virginia law is clear: an *option* to repurchase is not an *obligation* to repurchase, and therefore does not constitute a debt between the parties. *E.g.*, *Holladay*, 43 S.E. 616; *Clemons v. Home Savers*, 530 F. Supp. 2d 803 (E.D. Va. 2008), *aff'd*, 273 F. App'x 296 (4th Cir. 2008) (per curiam). In *Holladay*, the defendant purchased the plaintiff's property. As part of the transaction, he also paid off a debt the plaintiff owed on the property. The parties later executed an option agreement that let the plaintiff repurchase the property within two years. *Holladay*, 43 S.E. at 616-17. The Supreme Court of Appeals of Virginia ruled that there was no debt between the parties because the defendant's "payment of [the plaintiff's] indebtedness did not constitute a new debt." *Id.* at 618. Therefore, the transaction constituted a sale with an option to repurchase, not an equitable mortgage.

A federal district court recently affirmed this principle in *Clemons*, 530 F. Supp. 2d 803. In *Clemons*, the defendant

company purchased the plaintiff's home and assumed her mortgage, but gave her the option to repurchase the home if she made monthly lease payments and later paid 90 percent of the home's appraised value. *Id.* at 806-07. Although the plaintiff remained in the home for several months, she could not obtain the necessary financing to pay the option price by the required date. *Id.* at 807. When the plaintiff sued under the TILA, the district court found that the transaction had not created an equitable mortgage because the plaintiff "was not obligated to repurchase the property"; she could have vacated the property at the end of her lease; and the defendant had no recourse against her if it sold the property and could not recover on its investment. *Id.* at 809.

In response, the Johnsons cite several cases for the proposition that an option to repurchase does constitute a debt between the parties. *Snavely v. Pickle*, 70 Va. 27 (1877); *Tuggle v. Berkeley*, 43 S.E. 199 (Va. 1903); *Magee v. Key*, 191 S.E. 520 (Va. 1937); *Johnson v. Johnson*, 33 S.E.2d 784 (Va. 1945). But these cases all involved a promise to repay a specific debt advanced by the grantee and secured by a deed to the property. In *Tuggle*, for example, a woman conveyed a lot and residence to her son-in-law in exchange for his payment of $600 of delinquent taxes on the property. 43 S.E. at 199-200. The deed stated that the son-in-law would reconvey the property to her if she repaid the $600 plus interest. *Id.* The Supreme Court of Appeals of Virginia found that the transaction involved an implied promise to repay the debt, and therefore created an equitable mortgage.

This case by contrast is like the transactions at issue in *Holladay* and *Clemons*, where the sale of the property created no debt between the parties. The only debt created from this transaction was Washington's own mortgages taken to purchase the Johnsons' home. Washington, not the Johnsons, incurred an obligation to make payments on the new loans. In fact, the Johnsons were not obligated beyond their monthly payments—they enjoyed an option to repurchase, but they

could have stopped making payments and vacated the home at the end of twelve months, and Washington would have lacked any legal recourse against them. *See Clemons*, 530 F. Supp. 2d at 809. In the event that housing prices fell and the proceeds from any sale did not cover the amount still owed, Washington would be obligated to pay—the Johnsons would not. *See Holladay*, 43 S.E. at 618. The relationship of Washington to the Johnsons was clearly one of buyer to seller, not creditor to debtor. There is therefore no basis for finding an equitable mortgage. *See Seven Springs*, 159 B.R. at 755-56.

### III.

Even if the Johnsons could show they owed some debt to Washington, we would still need to find equitable circumstances to conclude that the transaction created an equitable mortgage. *Hunter v. Bane*, 149 S.E. 467, 468-69 (Va. 1929). In *Seven Springs*, 159 B.R. at 756, the court narrowed the list of relevant circumstances to four: "(1) intentions of the parties; (2) adequacy of consideration; (3) retention of possession by the grantor; and (4) satisfaction or survival of the debt."

We can determine the parties' intentions from their actions and from the plain terms of the documents they signed. *Clemons*, 530 F. Supp. 2d at 810. Mr. and Mrs. Johnson here engaged in a formal, arms-length transaction and signed numerous documents stating the terms of the sale. *Cf. Johnson*, 33 S.E.2d at 789-90. When the Johnsons first sought to refinance, they spoke with Robinson, who warned them that they would not be able to refinance given their poor credit history. Next, the Johnsons met with Washington, a private investor, who presented them with an "Offer to Purchase Real Estate." They signed this document and later attended a real estate closing with Washington. In total, Mr. and Mrs. Johnson signed no less than four documents indicating they were selling their home. On two of the documents (the Offer and the HUD-1 Settlement Statement), they signed next to the word "Seller."

The Johnsons were not unsophisticated parties: both had college degrees and previously had completed at least two real estate closings and one refinance. *See Clemons*, 530 F. Supp. 2d at 810 ("Having refinanced three times, [the plaintiff] certainly understood that her agreement with [the defendant] was unlike her previous mortgage loan."). In fact, they conceded that they had never read the documents or asked any questions about the transaction, which would have yielded information about the terms of the sale. Given that the Johnsons were on notice that they could not refinance again, and given the clear terms of the documents they signed, it is difficult to credit their argument that they merely intended to take out a loan from Washington.

Next, the Johnsons argue that finding an equitable mortgage is proper because Washington's purchase price of $212,800 was less than the home's claimed value of $260,000. But this difference is much less than the disparate values seen in cases finding an equitable mortgage. *See, e.g.*, *Magee*, 191 S.E. at 522 (where the grantor received 58 percent of the property's market value). Nor do the Johnsons show that they could have received more for the house given market conditions and their need to sell quickly.

Indeed, the Johnsons benefited from the transaction in several respects: they owed nothing to NovaStar or to any other mortgage company, they could remain in the home, and they could walk away at the end of twelve months if they were no longer able or no longer wished to live there. Like many parties raising equitable mortgage claims, the Johnsons "took advantage of the only available opportunity to remain in [their] home." *Clemons*, 530 F. Supp. 2d at 810. Given their circumstances, they likely received the best deal they could get. And to the extent they did face hardship—for example, in their inability to pay the final portion of the repurchase price—it arose not from the terms offered by Washington, but from the Johnsons' inability to attract financing. The Contract's terms did not present an impossible barrier to repur-

chasing. But the Johnsons' odds of obtaining the necessary financing would clearly depend on their creditworthiness. The Johnsons faced a difficult situation not because Washington offered them unattainable terms, but because, due to their poor credit history and previous bankruptcy filings, lenders would be unlikely to regard them as an acceptable credit risk.

Finally, although continued possession of the property is one factor indicating the parties' intentions, *Seven Springs*, 159 B.R. at 757 (citing *Tuggle*, 43 S.E. at 202), it is far from dispositive. *Hunter*, 149 S.E. at 469. Real estate transactions often involve purchase and lease-back arrangements where the grantor continues living in the home, but not all such transactions constitute equitable mortgages. *E.g.*, *Clemons*, 530 F. Supp. 2d at 810. Instead, continued possession can buttress an equitable mortgage claim where other factors, such as the presence of a debt and significantly inadequate consideration, already suggest that the grantor implied a promise to repay. *E.g.*, *Tuggle*, 43 S.E. at 200-01. Here, the absence of those other factors, along with the form of the transaction—an absolute sale followed one week later by a contract for an option to repurchase—suggest that the Johnsons' possession of the home was part of a typical purchase and lease-back arrangement rather than a sign of continued ownership.

In sum, the relevant circumstances do not suggest that equity should intervene to contradict the plain terms of the documents that the Johnsons signed.

## IV.

Finally, we reject the Johnsons' claim of fraud because the statements made by Washington and Robinson (*e.g.*, "We want to help you") were either accurate or were forward-looking statements of opinion. *See, e.g.*, *Yuzefovsky v. St. John's Wood Apartments*, 540 S.E.2d 134, 142 (Va. 2001). Even assuming that Robinson did mislead the Johnsons, which we do not suggest, the documents that they signed

plainly stated the terms of the transaction and more than corrected any misleading oral statements. *See, e.g.*, *Rollison v. Washington Nat'l Ins. Co.*, 176 F.2d 364, 367 (4th Cir. 1949). Plaintiffs cannot be heard to complain when they failed to read the relevant documents. We therefore affirm the judgment of the district court.*

*AFFIRMED*

---

*The Johnsons also formally appeal the district court's award of damages to Washington on his breach of contract counterclaim. This issue, however, was not briefed or argued on appeal. In all events, the Contract's plain terms required the Johnsons to make monthly lease payments to Washington through July 2006, an obligation they failed to fulfill.