# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 1, 2020 Session

## CHARLENE C. BRADFORD v. JOSH TERRY ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 43291, 2014-201        James G. Martin III, Chancellor**

_____

### No. M2019-01340-COA-R3-CV

_____

To avoid foreclosure, a homeowner and her daughter made a deal to sell their home. The purchasers paid off the mortgage and, after acquiring title, leased the home back to the daughter with an option to purchase. When the daughter failed to make timely lease payments, the purchasers sued for possession of the home. The (former) homeowner filed her own suit, alleging that the transaction was an equitable mortgage subject to rescission under the Federal Truth in Lending Act. She also alleged that the transaction violated Tennessee's Foreclosure-Related Rescue Services Act. Following a trial, the court agreed that the transaction created an equitable mortgage that violated the Truth in Lending Act. So, under the federal act, the court rescinded the transaction and awarded damages and attorney's fees. The court dismissed the claims under the Foreclosure-Related Rescue Services Act after determining it was inapplicable. On appeal, we conclude that the Foreclosure-Related Rescue Services Act, rather than the Truth in Lending Act, applied. We affirm the trial court's rescission of the transaction under the state act. We reverse the awards under the Truth in Lending Act.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
in Part, Reversed in Part, and Vacated in Part; Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ANDY D. BENNETT, J., joined.

Timothy V. Potter and Andrew E. Mills, Dickson, Tennessee, for the appellants, Chris Mulé, Donna Mulé, Josh Terry, Terri Baker, and Ryan White.

David J. Tarpley, Nashville, Tennessee, and Rae Anne Smith, Tullahoma, Tennessee, for the appellees, Charlene Bradford and Courtney Varallo.

# OPINION

## I.

### A.

Following her husband's death, Charlene Bradford and her adult daughter, Courtney Varallo, took out a loan to pay burial expenses, hospital bills, and living expenses. As security, Ms. Bradford signed a deed of trust for the home she co-owned with her late husband. Ms. Bradford shared the home with Ms. Varallo and Ms. Varallo's two children.

When the loan came due one year later, Ms. Bradford and Ms. Varallo could not pay. They attempted to refinance the loan, but those efforts proved unfruitful. Then, two days before the scheduled foreclosure sale, a mortgage banker suggested that Chris Mulé, one of the owners of Tennessee Title Services, LLC, might be a possible source of financing.

Ms. Bradford and Ms. Varallo contacted Mr. Mulé, who proposed that the parties meet at his office the next day. In the interim, Mr. Mulé determined the pay-off for the mortgage and ran a title search. The title search revealed a judgment lien on the property and some back taxes.

At the meeting with Mr. Mulé, the day before the scheduled foreclosure, Ms. Bradford recalled him saying, "We can help you." And he said, "There will be some stipulations, but we can help you save your home, so no problem." The help took the form of three documents. The first document was a Purchase and Sale Agreement. The agreement obligated Ms. Bradford to sell the property under threat of foreclosure, consisting of the home and nearly 7 acres, for $51,000. The purchasers under the agreement were Mr. Mulé's wife, Donna Mulé, and the other owners of Tennessee Title Services, Josh Terry, Ryan White, and Terri Baker. Mr. Mulé would later testify that he wanted the property in his wife's name rather than his own for estate planning purposes. The second document was a warranty deed transferring the property to Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker.

The third and final document was a Lease Purchase Agreement. That agreement allowed Ms. Bradford's daughter, Ms. Varallo, to lease the property in exchange for monthly rent payments of $500. Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker also granted Ms. Varallo the option to purchase the property for $61,000, but only if the option was exercised and the sale was closed by the one-year anniversary of the agreement.[1]

---

[1] The Lease Purchase Agreement provided as follows:

2

Thereafter, the option price increased to $71,000. The option expired and Ms. Varallo had to vacate the property on a specified date, just over two years after the date of the agreement. But the agreement did not obligate Ms. Varallo to lease the property for a fixed term.

After the agreements and the deed were signed, Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker paid $48,655.14 to pay-off the loan in foreclosure and to satisfy the judgment lien. Although the total amount paid to satisfy the loan and the judgment was less than the agreed purchase price, Ms. Bradford received no monies from the sale.

Ms. Bradford read the agreements and the deed and claimed to understand them. But, despite that, Ms. Bradford thought she and her daughter were getting a loan. When asked later about the terms of the loan, she testified, "It was a two-year loan, and then we had options, you know, to buy before the – in those two years." The cost of borrowing was "[$]10,000 a year for those two years." Ms. Bradford also thought that the property was being taken out of her name and put in her daughter's name. She did not like that, but she understood it to be necessary because only her daughter had a job.

According to Ms. Bradford, she understood the true nature of the transaction several weeks after the closing. Ms. Bradford's sister, Barbara Grinder, became concerned after Ms. Bradford described the transaction to her. So Ms. Grinder checked the property tax records, which confirmed that Ms. Varallo was not the owner.

Meanwhile, due to an illness, Ms. Varallo was having difficulty making timely rent payments. The delinquency led Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker to declare Ms. Varallo in default of the Lease Purchase Agreement. Ms. Grinder tried to intervene. But her offer to pay the option price on behalf of Ms. Varallo was declined. According to Mr. Terry, the right to purchase the property at the option price belonged exclusively to Ms. Varallo. So he told Ms. Grinder that he and the other owners would only sell the property to her for fair market value.

---

The purchase price for the Property is $61,000.00 **(If Buyer completes purchase on or before July 17, 2013.)**

. . . .

**In the event Buyer does not complete the purchase of subject property on or before July 17, 2013, the sales price will increase to the sum of SEVENTY-ONE THOUSAND AND 00/100 DOLLARS ($71,000.00), on August 1, 2013. If closing of this transaction has not taken place by August 1, 2014, the Lease Purchase Agreement becomes NULL AND VOID AND BUYER MUST VACATE SUBJECT PROPERTY IMMEDIATELY.**

Ms. Bradford attempted to keep the rent payment current. But when one of her checks was returned, Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker terminated the Lease Purchase Agreement.

B.

Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker filed a detainer action against Ms. Varallo. In response, Ms. Bradford and Ms. Varallo gave notice that they were rescinding the sale/leaseback transaction under the Truth in Lending Act ("TILA") and Regulation Z. *See* 15 U.S.C. § 1635 (Supp. 2019); 12 C.F.R. § 1026.23 (2021).

Ms. Bradford also filed a complaint against Mr. and Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker (collectively, "Defendants"). She claimed that the sale/leaseback transaction was an equitable mortgage. Ms. Bradford alleged that Mr. Mulé committed fraud by misrepresenting the true nature of the transaction and that those fraudulent misrepresentations should be imputed to Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker. She also alleged that Defendants, through Mr. Mulé, violated the Tennessee Consumer Protection Act ("TCPA") by "[r]epresenting that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve which are prohibited by law." *See* Tenn. Code Ann. § 47-18-104(b)(12) (Supp. 2021).

For relief, Ms. Bradford sought to set aside or reform the transaction. She claimed that the transaction was void and unenforceable under the Foreclosure-Related Rescue Services Act. *See id.* §§ 47-18-5401-5402 (2013). She claimed that Defendants had engaged in unconscionable conduct by, in effect, making a loan at a usurious rate. So Defendants could not recover any interest or charges. *See id.* § 47-14-117(c) (2013). And she claimed that the transaction should be rescinded under TILA. *See* 15 U.S.C. § 1635(a). Ms. Bradford also sought damages, statutory penalties, and attorney's fees.

Defendants answered and asserted counterclaims against Ms. Bradford. They sought damages and attorney's fees under the bad check statute. *See* Tenn. Code Ann. § 47-29-101 (2013). They claimed that, by her actions, Ms. Bradford became liable under the Lease Purchase Agreement. And they requested damages based on unjust enrichment and fraud.

The detainer action filed against Ms. Varallo and the action filed against Defendants were consolidated in the chancery court. And the court conducted a one-day trial. The court held that the transaction was an equitable mortgage. The court reasoned that Ms. Bradford and Ms. Varallo were indebted to Defendants by virtue of the purchase option. They were "required to repay Defendants if they wanted to retain ownership of the home." The court also found that, based on the circumstances surrounding the transaction, the parties intended the transaction to be a mortgage. *See Hensley v. Britt*, No. 01A01-9607-

4

CH-00296, 1996 WL 709375, at *5 (Tenn. Ct. App. Dec. 11, 1996) (listing six factors relevant to the parties' intent for an equitable mortgage claim).

As an equitable mortgage, the court concluded the transaction was subject to TILA. And, because Defendants did not provide the required TILA and Regulation Z consumer credit disclosures, Ms. Bradford and Ms. Varallo could still timely rescind the transaction. *See* 15 U.S.C. § 1635(a). Based on the pre-suit notice of rescission, the court ordered the property restored to Ms. Bradford and that she be refunded the rent payments. The court also awarded her statutory damages of $4,000 plus costs and attorney's fees. *Id.* § 1640(a).

The court dismissed Ms. Bradford's claim under the Foreclosure-Related Rescue Services Act. It found that Defendants did not fall within the definition of a "foreclosure-rescue consultant." Defendants were "not mak[ing] a 'solicitation, representation or offer' in exchange for payment of money." *See* Tenn. Code Ann. §47-18-5401(2) (defining a foreclosure-related consultant). Defendants "simply responded to Ms. Bradford's inquiry," and they "believed they were purchasing the property from Ms. Bradford with the option for Ms. Varallo to buy it back at a later date."

The court also dismissed the usury and TCPA claims. Although the court determined the effective interest rate on the "debt" was usurious, the court concluded that the claim was barred under the usury statutes because Ms. Bradford had not paid, or tendered to the court, the principal plus lawful interest and loan charges due. And the TCPA did not apply because Ms. Bradford had not acquired any property in the transaction.

Defendants' counterclaims, other than their unjust enrichment claim, met the same fate. The court found that Ms. Bradford had benefited from the payoff of the loan in foreclosure and the satisfaction of the judgment lien as well as from the payment of property insurance premiums and taxes over the years. So, by virtue of the rescission of the transaction, she had been unjustly enriched by those amounts. And Defendants had improved the home. While the consolidated cases had been pending, Defendants, under court order, had replaced an HVAC unit in the home. After deducting the rent paid under the Lease Purchase Agreement as well as the statutory damage award of $4,000, the court determined that Ms. Bradford owed Defendants $31,798.67. The court ordered her to pay that amount in satisfaction of her obligations under TILA to tender to the creditor all proceeds of the loan. *See* 15 U.S.C. § 1635(b).

After considering affidavits submitted by counsel, the court awarded Ms. Bradford attorney's fees of $103,750. In doing so, it again rejected arguments from Defendants that attorney's fees were not recoverable because TILA did not apply to the transaction. The court also found, over the objections of Defendants, that the fees were reasonable.

## II.

Because this was a bench trial, our review is de novo on the record with a presumption that the trial court's factual findings are correct, unless the evidence preponderates against those findings. TENN. R. APP. P. 13(d). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We review the trial court's conclusions of law de novo with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

On appeal, Defendants argue that the transaction was not an equitable mortgage. Even if it was, they argue, TILA does not apply to equitable mortgages. Of course, Ms. Bradford and Ms. Varallo disagree. And they raise their own issue. They argue that the Foreclosure-Related Rescue Services Act applies and that Defendants violated it. And by violating the Foreclosure-Related Rescue Services Act, Defendants also violated the TCPA.

The TILA and equitable mortgage claims both require the existence of a debt. For an equitable mortgage to exist, there first must be proof "that the grantor was indebted to the grantee." *Hensley*, 1996 WL 709375, at *5. And TILA governs certain consumer credit transactions. 15 U.S.C. § 1601(a) (Supp. 2019). Under TILA, "[t]he term 'credit' means the right granted by a creditor to a debtor to defer payment of *debt* or to incur *debt* and defer its payment." *Id.* § 1602(f) (Supp. 2019) (emphasis added). So to resolve the issues raised by Defendants, we must consider whether there was a debt.

### A.

"Debt" means "[l]iability on a claim." *Debt*, BLACK'S LAW DICTIONARY (11th ed. 2019). And there is no liability without an obligation. *See Liability*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "liability" as "being legally obligated"). So, in transactions involving a sale and repurchase agreement, "the lack of any binding obligation on the grantor to pay" the repurchase price "is generally accepted as decisive proof that it was not meant as a mortgage." 59 C.J.S. *Mortgages* § 74, Westlaw (database updated Nov. 2021); *see id.* § 31.

Here, the chancery court determined that the option to purchase in the Lease Purchase Agreement created a debt. Although Ms. Bradford and Ms. Varallo "were not obligated to repay the [D]efendants in an absolute sense," the court reasoned, they "were required to repay the Defendants if they wanted to retain ownership in the home." *See Perry v. Queen*, No. Civ. 3:05-0599, 2006 WL 481666, at *4 (M.D. Tenn. Feb. 27, 2006); *see also In re Cox*, 493 F.3d 1336, 1341 (11th Cir. 2007) (applying Georgia law) (reasoning that the lack of an "express creation of a recourse obligation . . . cannot be the determinative factor"); *accord In re 716 Third Ave. Holding Corp.*, 340 F.2d 42, 46 (2d Cir. 1964)

(applying New York law); *Kerfoot v. Kessener*, 84 N.E.2d 190, 200 (Ind. 1949); *Ministers Life & Cas. Union v. Franklin Park Towers Corp.*, 239 N.W.2d 207, 210 (Minn. 1976); *Parrish v. McDaniel*, 358 S.W.2d 32, 36 (Mo. 1962); *Rice v. Wood*, 346 S.E.2d 205, 210 (N.C. Ct. App. 1986); *Tuggle v. Berkeley*, 43 S.E. 199, 201 (Va. 1903). It was enough that Ms. Bradford and Ms. Varallo "intended to repay the Defendants once the funds were available." We disagree.

An obligation must be absolute. That is its nature. *See Crotzer v. Shawl*, 5 Tenn. App. 240, 245 (1927) ("The very essence of an obligation is its validity and enforcement."). For a repurchase agreement to create a debt, then, the grantee must have a remedy against the grantor. *Conway's Ex'rs v. Alexander*, 11 U.S. (7 Cranch) 218, 237 (1812); *see Bennet v. Holt*, 10 Tenn. (2 Yer.) 6, 9 (1820) (rejecting an equitable mortgage claim where there was "no obligation in [the grantor] to repay the money"—he could "not be sued for it, but [wa]s to advance it at his own will and pleasure"); 59 C.J.S. *Mortgages* § 73 (explaining that the debt must "be one that may be enforced in an action at law or by foreclosure proceedings"); *see also* 54A AM. JUR. 2D *Mortgages* § 105, Westlaw (database updated Nov. 2021). But, as Ms. Bradford and Ms. Varallo conceded at oral argument, Defendants could not have sued and obtained a judgment for the amount of the purchase price absent exercise of the option. Ms. Bradford and Ms. Varallo were never obligated to pay the purchase price to Defendants. They certainly had an incentive to exercise the option, but they were under no obligation to do so.

In short, we agree with the authorities that hold that "an *option* to repurchase is not an *obligation* to repurchase." *Johnson v. Washington*, 559 F.3d 238, 243 (4th Cir. 2009) (applying Virginia law); *see Charter Gas Engine Co. v. Entrekin*, 246 P. 1038, 1040 (Ariz. 1926); *Henslee v. Ratliff*, 989 S.W.2d 161, 164 (Ark. Ct. App. 1999); *Holmberg v. Hardee*, 108 So. 211, 220 (Fla. 1925); *Tingle v. Tingle*, 179 S.E.2d 51, 55 (Ga. 1970); *McNamara v. Culver*, 22 Kan. 661, 669 (1879); *Sauer v. Fischer*, 225 N.W. 518, 519 (Mich. 1929); *Boysun v. Boysun*, 368 P.2d 439, 441-42 (Mont. 1962); *Sargent v. Hamblin*, 260 P.2d 919, 926 (N.M. 1953); *Am. Nat'l Bank v. Groft*, 229 N.W. 376, 379 (S.D. 1930); *Parmenter v. Kellis*, 153 S.W.2d 965, 968 (Tex. Civ. App. 1941); *Smyth v. Reed*, 78 P. 478, 479 (Utah 1904); *Liskey v. Snyder*, 49 S.E. 515, 526 (W. Va. 1904); *cf. Davis v. Landis*, 53 N.E.2d 544, 544 (Ind. App. Ct. 1944) (Because the "note contained an unconditional promise to pay," the transaction "could not . . . amount to a conditional sale."); *accord Lerner Shops of La. v. Reeves*, 73 So. 2d 490, 497 (La. Ct. App. 1954). So Ms. Bradford's and Ms. Varallo's option to repurchase did "not constitute a debt between the parties." *See Johnson*, 559 F.3d at 243.

Because there was no debt, there could not be clear and convincing evidence that the sale/leaseback transaction was an equitable mortgage.[2] *See Van Dyke v. Inman*, 362

---

[2] Where "there is a provision for reconveyance in the deed or by separate contract," a different standard other than clear and convincing evidence may apply. *See Edwards v. Hunt*, 635 S.W.2d 696, 699

S.W.2d 795, 801 (Tenn. Ct. App. 1962) (holding that, to prove that "a deed absolute on its face . . . was in fact intended to be a mortgage," the evidence "must be clear, cogent and convincing, leaving no reasonable doubt as to the real character of the transaction"). Without a debt, there could also be no claim under TILA. 15 U.S.C. § 1602(f).

B.

Ms. Bradford and Ms. Varallo submit that the chancery court erred in concluding that the Foreclosure-Related Rescue Services Act did not apply. This issue involves statutory interpretation, which is a question of law that we review de novo. *In re Rader Bonding Co.*, 592 S.W.3d 852, 858 (Tenn. 2019). When interpreting statutes, our "primary purpose . . . is to give effect to the legislative intent." *Bidwell ex rel. Bidwell v. Strait*, 618 S.W.3d 309, 319 (Tenn. 2021); *see Kyle v. Williams*, 98 S.W.3d 661, 664 (Tenn. 2003) ("The duty of this Court in construing statutes is to effectuate legislative intent."). We determine legislative intent "primarily from the natural and ordinary meaning of the language used." *Kyle*, 98 S.W.3d at 664. We "presume that the legislature says . . . what it means and means . . . what it says" in a statute. *Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000) (citation omitted). So, when a statute's language is clear, "we must apply its plain meaning in its normal and accepted use." *State v. Frazier*, 558 S.W.3d 145, 152 (Tenn. 2018) (citation omitted).

The Foreclosure-Related Rescue Services Act prohibits a "foreclosure-rescue consultant" from, among other things, "[e]ngag[ing] in or initiat[ing] foreclosure-related rescue services without first executing a written agreement with the homeowner for foreclosure-related rescue services." Tenn. Code Ann. § 47-18-5402(a)(2). A "foreclosure-rescue consultant" is "a person who directly or indirectly makes a solicitation, representation or offer to a homeowner to provide or perform . . . foreclosure-related rescue services" in exchange "for payment of money or other valuable consideration." *Id.* § 47-18-5401(2). And a "foreclosure-related rescue service" is "any service related to or promising assistance in connection with":

> (A) Stopping, avoiding or delaying foreclosure proceedings concerning residential real property; or

> (B) Curing or otherwise addressing a default or failure to timely pay with respect to a residential mortgage loan obligation . . . .

*Id.* § 47-18-5401(1).

---

(Tenn. Ct. App. 1982). That is, "evidence of doubtful import will be construed in favor of the theory that a mortgage was intended." *Id.* But that standard only applies if "the grantor remains in possession without accounting for rents or profits." *Id.* Here, although Ms. Bradford and Ms. Varallo remained in possession, they paid rent.

We conclude that the Foreclosure-Related Rescue Services Act did apply. When Ms. Bradford and Ms. Varallo met with Mr. Mulé, they had defaulted on their mortgage. They were desperate to save their home from foreclosure, which was scheduled for the next day. After Ms. Bradford and Ms. Varallo explained their situation to Mr. Mulé, Defendants paid off the loan and a judgment lien in exchange for a deed to the home. In so doing, Defendants cured the loan default. *See id.* § 47-18-5401(1)(B). And, as designed, the transaction stopped the impending foreclosure on the home Ms. Bradford and Ms. Varallo shared. *See id.* § 47-18-5401(1)(A). As part of the transaction, Defendants conducted a title search, checked tax records, contacted lienholders, and structured and documented the transaction. So Defendants performed services related to both stopping a foreclosure and curing a default. *See id.* § 47-18-5401(1).

Defendants also acted as foreclosure-rescue consultants. On the day Mr. Mulé met with Ms. Bradford and Ms. Varallo, he represented to them that he and Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker would perform foreclosure-related rescue services. *See id.* § 47-18-5401(2). He assured Ms. Bradford and Ms. Varallo that there was a way that they could help with the impending foreclosure. And Ms. Mulé, Mr. Terry, Mr. White, and Ms. Baker offered to perform foreclosure-related rescue services by agreeing in writing to purchase Ms. Bradford's property and to lease it back with an option to purchase. *See id.* Significantly, the property they acquired was in foreclosure, and the price they offered for the property was roughly equal to the amount of the outstanding liens. Also, Mr. Mulé admitted that the option price was set so that Defendants would turn a profit on the monies they advanced to stave off the foreclosure, not on the value of the property. And they received "valuable consideration" by obtaining a deed to the home and rental income under the Lease Purchase Agreement. *See id.*

We also agree with Ms. Bradford and Ms. Varallo that the evidence showed that Defendants violated the Foreclosure-Related Rescue Services Act. Defendants did not execute a written agreement for foreclosure-related rescue services with Ms. Bradford and Ms. Varallo. *See id.* § 47-18-5402(a)(2). And the agreements executed by the parties did not contain the provisions required by the Act. *See id.* § 47-18-5402(b), (d).

## C.

Having concluded that Defendants violated the Foreclosure-Related Rescue Services Act, the question becomes the appropriateness of the remedy. The chancery court rescinded the transaction under TILA. But TILA did not apply.

Even so, under the Foreclosure-Related Rescue Services Act, the transaction was void. *See id.* § 47-18-5402(g). Our supreme court has treated "void" and "to set aside" as interchangeable terms. *See Dailey v. S. Heel Co.*, 785 S.W.2d 344, 347 (Tenn. 1990) ("Plaintiff did not seek to set aside or void the settlement, but to the contrary, he insisted

9

that the settlement was valid."). Rescission "involves the avoidance, *or setting aside*, of a transaction." *Mills v. Brown*, 568 S.W.2d 100, 102 (Tenn. 1978) (emphasis added). Under the Foreclosure-Related Rescue Services Act, the transaction was also "unenforceable as a matter of . . . public policy." Tenn. Code Ann. § 47-18-5402(g). In other words, it was illegal. *See Blackburn & McCune, PLLC v. Pre-Paid Legal Servs., Inc.*, 398 S.W.3d 630, 651 (Tenn. Ct. App. 2010) (explaining that "the term 'illegality' has been replaced by 'unenforceability on the grounds of public policy'"). Rescission "may be grounded on illegality in the formation of a contract." 12A C.J.S. *Cancellation of Inst.* § 44, Westlaw (database updated Nov. 2021); *see Palmer Bros. v. Havens*, 193 S.W.2d 91, 92 (Tenn. Ct. App. 1945) (reasoning that an illegal agreement may be set aside); 17B C.J.S. *Contracts* § 628, Westlaw (database updated Nov. 2021) (explaining that rescission is appropriate "where there is original invalidity" or "illegality"); *see also* 92 C.J.S. *Vendor & Purchaser* § 280, Westlaw (database updated Nov. 2021). So, although TILA was inapplicable, rescission was a proper remedy. *See also* 12A C.J.S. *Cancellation of Inst.* § 1 ("Rescission is the cancellation of . . . a contract that is . . . void from its inception.").

Rescission "amounts to the unmaking of a contract, or an undoing of it from the beginning." *Walsh v. BA, Inc.*, 37 S.W.3d 911, 916 (Tenn. Ct. App. 2000) (citation omitted). It "is intended to return the parties to the positions they were in before the transaction took place." *Lamons v. Chamberlain*, 909 S.W.2d 795, 800 (Tenn. Ct. App. 1993) (citation omitted); *see Goodale v. Langenberg*, 243 S.W.3d 575, 591 (Tenn. Ct. App. 2007) (explaining that rescission is "designed to restore the parties to the position they would have occupied had the transaction not occurred"); *see also Lindsey-Davis Co. v. Siskin*, 358 S.W.2d 331, 333 (Tenn. 1962) (reasoning that rescission requires placing the parties "in status quo"). So the parties must "return whatever they received under the rescinded [transaction]." 12A C.J.S. *Cancellation of Inst.* § 80; *see Lloyd v. Turner*, 602 S.W.2d 503, 510 (Tenn. Ct. App. 1980) ("[A] party seeking rescission of a contract must return . . . that which he has received under it."). When a real estate contract is rescinded, the buyer "is entitled to recover the purchase price or other consideration paid for the deed." *Minton's Estate v. Markham*, 625 S.W.2d 260, 262 (Tenn. 1981). And, usually, the seller is entitled to an offset for the "reasonable rental value of the premises." 92 C.J.S. *Vendor & Purchaser* § 281. But that is not so where the buyer "never uses or occupies the land." *Id.* § 311. The buyer is also "entitled to reimbursement for the costs of necessary repairs," insurance premiums, and taxes paid on the property. 12A C.J.S. *Cancellation of Inst.* §§ 194-95.

Here, the court restored the property to Ms. Bradford. And it considered the offsets to which Ms. Bradford and Defendants would be entitled. Defendants paid off liens, paid property insurance and taxes, and installed a new HVAC unit. For their part, Ms. Bradford[3] and Ms. Varallo paid rent to Defendants. But the court also considered a statutory award

---

[3] The court credited all rent as if it had been paid by Ms. Bradford. That finding is not challenged on appeal.

of damages under TILA, which we have concluded does not apply. And, in entering a final judgment, the chancery court stayed its order pending the outcome of this appeal and ordered that rent of $500 per month should continue. So we vacate the award of $31,798.67 that the court treated as Ms. Bradford's "tender" obligation under TILA. *See* 15 U.S.C. § 1635(b). On remand, the court should determine the amount, if any, necessary to return the parties to the positions they were in before the sale/leaseback transaction took place. *See Lamons*, 909 S.W.2d at 800.

Finally, the court also awarded attorney's fees under TILA. We reverse the award of attorney's fees under TILA. But we have determined that the evidence preponderates in favor of a finding that Defendants violated the Foreclosure-Related Rescue Services Act. As Ms. Bradford points out, a violation of the Foreclosure-Related Rescue Services Act is a violation of the TCPA. *See* Tenn. Code Ann. § 47-18-104(b)(44). Under the TCPA, a court may award a successful plaintiff attorney's fees. *Id.* § 47-18-109(e)(1) (Supp. 2021). So, on remand, the chancery court should also consider whether Ms. Bradford is entitled to her attorney's fees under the TCPA.

## III.

The transaction between Ms. Bradford and Defendants was neither an equitable mortgage nor subject to TILA. But the evidence preponderates in favor of a finding that Defendants violated the Foreclosure-Related Rescue Services Act. So we affirm the rescission of the transaction. We reverse the award of statutory damages and attorney's fees to Ms. Bradford under TILA. And we vacate the award of the amount intended to return the parties to the positions they were in before the transaction took place. The case is remanded for further proceedings consistent with this opinion.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE

11